# No. 24-50564

# In the United States Court of Appeals for the Fifth Circuit

———————————————

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

**v.**

**PETER VILLA CORDOVA,**

Defendant-Appellant.

———————————————

On Appeal from the United States District Court
for the Western District of Texas

———————————————

**APPELLEE'S BRIEF FOR THE UNITED STATES**

———————————————

Margaret Leachman
Acting United States Attorney

Lauren Tanner Bradley
Assistant United States Attorney
Western District of Texas
903 San Jacinto, Suite 334
Austin, Texas 78701
(512) 370-1294

**Recommendation on Oral Argument**

This case presents a Second Amendment challenge to 18 U.S.C. § 922(g)(1). This Court recently upheld § 922(g)(1) against a Second Amendment challenge in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024). The straightforward application of that case supports affirmance here. Therefore, the briefs and record adequately present the facts and legal arguments relevant to this appeal, and oral argument would not significantly aid the decisional process. *See* Fed. R. App. P. 34(a)(2)(C).

# Table of Contents

Recommendation on Oral Argument ..........................................................ii

List of Authorities..........................................................................iv

Jurisdiction ...................................................................................1

Statement of the Issues.....................................................................1

Statement of the Case ......................................................................1

Summary of the Argument ................................................................4

Standard of Review .........................................................................4

Arguments ....................................................................................5

Cordova's conviction under § 922(g)(1) comports with the Second Amendment....................................................................................5

    I.   *Rahimi* clarified that the analytical framework governing Second Amendment challenges is a principles-based approach....................................................................................5

    II.  Applying *Rahimi*'s principles-based approach, this Court upheld § 922(g)(1) facially and as applied to a convicted car thief. ....................................................................................7

    III. History and tradition support Cordova's § 922(g)(1) conviction, too. ................................................................10

        A.  Applying § 922(g)(1) to Cordova is consistent with this Nation's tradition of disarming individuals who commit serious crimes, including crimes that carried serious and permanent punishment at the founding. ......11

        B.  Applying § 922(g)(1) to Cordova is consistent with our history of disarming those who present a special danger of misusing firearms. ..............................16

            1.  Our tradition supports the principle that those who present a special danger of misusing firearms may be constitutionally disarmed. ............................16

            2.  Cordova's criminal record shows that he presents a special danger of misusing firearms. ......................28

Conclusion....................................................................................34

Certificate of Service .....................................................................35

Certificate of Compliance ................................................................35

# List of Authorities

**Cases**

*Baze v. Rees,*
  553 U.S. 35 (2008)........................................................................12

*Binderup v. Attorney General,*
  836 F.3d 336 (3d Cir. 2016) .................................................20, 41

*Bucklew v. Precythe,*
  139 S. Ct. 1112 (2019)..................................................................12

*District of Columbia v. Heller,*
  554 U.S. 57 (2008).................................................................passim

*Folajtar v. Attorney General,*
  980 F.3d 897 (3d Cir. 2020) .................................................20, 39

*Garland v. Range,*
  No. 23-374, 2023 WL 6623648 (U.S. Oct. 5, 2023) ..............11

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019)...............................................19, 28

*New York State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022)...................................................................passim

*Patterson v. Winn,*
  30 U.S. (5 Pet.) 233 (1831).........................................................24

*Respublica v. Donagan,* 2 Yeates 437 (Pa. 1799) ...................31

*State v. Davis,* 5 S.C.L. (3 Brev.) 3 (S.C. Const. Ct. App. 1811) ..........31

*State v. Hogan,*
  58 N.E. 572 (Ohio 1900)..............................................................36

*State v. Shelby,*
  2 S.W. 468 (Mo. 1886)..................................................................36

*Tennessee v. Garner,*
  471 U.S. 1 (1985)...........................................................................13

*United States v. Barton,*
633 F.3d 168, 174 (3d Cir. 2011) .................................................39

*United States v. Bullock,*
123 F.4th 183 (5th Cir. 2024) ......................................... 11, 17, 19

*United States v. Connelly,*
117 F.4th 269 (5th Cir. 2024) .................................................17

*United States v. Contreras,*
125 F.4th 725 (5th Cir. 2025) .................................................17

*United States v. Diaz,*
116 F.4th 458 (5th Cir. 2024) ......................................... passim

*United States v. Garcia,*
797 F.3d 320 (5th Cir. 2015).................................................39

*United States v. Howard,*
766 F.3d 414 (5th Cir. 2014).................................................5

*United States v. Hunt,*
123 F. 4th 697, 706 (4th Cir. 2024) .................................. 19, 37

*United States v. Jackson,*
110 F.4th 1120 (8th Cir. 2024) ................................... 13, 20, 37

*United States v. Luciano,*
329 F.3d 1 (1st Cir. 2003) .................................................39

*United States v. Rahimi,*
144 S. Ct. 1889 (2024).................................................... passim

## Statutes

18 U.S.C. § 3231..........................................................................1

18 U.S.C. § 922(g)(1)..................................................... passim

18 U.S.C. § 922(g)(8).................................................................6

Tex. Penal Code § 38.04 .................................................40

**Other Authorities**

Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971) ....................................................................9, 27

Beth A. Colgan, "Reviving the Excessive Fines Clause," 102 *Cal. L. Rev.* 277 (2014)........................................................13

Diarmuid F. O'Scannlain, "Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms," 95 *Notre Dame L. Rev.* 397, 405 (2019) ...................21

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-32 (1994)...................................24

Randolph Roth, "Why Guns Are and Are Not the Problem," *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019) .....................................31, 32

Stuart Banner, The Death Penalty: An American History 23 (2002) ....................................................................................12

**Historical Laws**

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879)......................33, 35

1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756)............................................................23

1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments (1811) ........................15

1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716) ...................................................................................23

2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756)..........................................23

2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 260-61 (1886) (1786 law) .........15

2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 664-65 (1886) .............................................. 14

4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1st ed. 1767) .......................................................................... 23

4 William Blackstone, *Commentaries on the Laws of England* 252 (1st ed. 1769) ................................................................................ 30

6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) ........................................................................ 27

6 William Waller Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619 (1819) ......................................... 13

9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature (1821) ................................................................................ 15

Act About Binding to the Peace, ch. 26, 1700 Pa. Laws 5 ...................... 30

Act About Binding to the Peace, ch. 4, 1700 Del. Laws 52; 1702 Conn. Acts 91 ....................................................................................... 30

Act Declaring the Mode of Proceeding in Certain Criminal Cases, ch. 30, § 16, 1789 Va. Laws 17-18 ............................................. 31

Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90 ....................................................................................... 26

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221 ............................... 33

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157 ......... 33

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73 ............................................ 32

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232 ........................ 35

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290 .................................................................................................... 33

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34 ........................................... 35

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 ............................... 32

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 ............35

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170.............................35

Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906) ...........................26

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14 ......................33

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112 .........................32

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21................35

Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815) ......................................................................26

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17 .................................32

Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664-65 ............................40

Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25....................35

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92 ............................33

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 .............................32

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 .....................33, 35

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87...........32, 35

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39 ..................................33

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.)............................34

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112 ................................33

Act of June 12, 1879, § 2, 1879 Ohio Laws 192.....................................35

Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904).............................................25

Act of June 14, 1701, ch. 7, 1702 Laws of New Hampshire 678, 794 ..............................................................................................41

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144.................33

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890) ................... 26

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355 ................ 35

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140 .................................................................................. 34

Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807) ....................................................... 26

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 .............................. 33

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80 .................................. 33

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879) .................. 35

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394 ................. 35

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 ....................... 33

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 ............................. 32

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274 ................. 35

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159 ........... 32, 35

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468 ................. 33

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556 ......................... 33

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656 ........................... 33

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69 .............................. 35

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297 .......... 35

Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869) ...................................... 25

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 ............ 33

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30 .............. 35

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67 .................................................................................. 33

Act of Nov. 27, 1786, ch. 21, *A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force* 33 (1794) ..................................................25

Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America (1767)...............16

An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 112-15 (1790).............................................14

An Act to Establish the Post Office and Post Office and Post Roads within the United States, § 17, 1 Stat. 232, 237 (1792)............14

Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.) .............................21

Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700 - 8 March, 1702 (Feb. 26, 1701) (Edward Bateson ed., 1937)...................................................................22

Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866) ..................................36

Eliphalet Ladd, *Burn's Abridgement, or the American Justice* 22-24 (2d ed. 1792) (N.H.)...........................................................................25

G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737).......................................23

Giles Jacob, *The Modern Justice* 338 (1716) ..........................................22

James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.) ...............................................................................................25

James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.)..................................................................................25

James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.) .........................................................................................................25

John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840)..................................................................................29

Joseph Gales, *Prevention of Crime, in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).......................................30

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.).............................................25

Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873)........................................................33

Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) .........................................................28

Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), in Historical Manuscripts Commission, Fifteenth Report, Appendix, Part VI (1897) .......................................................22

Mass. Rev. Stat. ch. 134, § 16 (1836) ......................................................30

Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13 (Eng.)..................................21

Miss. Rev. Code ch. 77, § 2964 (1880)......................................................35

Order of Council to Lord Lieutenants (Sept. 5, 1745), in Historical Manuscripts Commission, Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk (1905) ...............................................................22

Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland*, 1638-1674, at 138 (E.B. O'Callaghan ed., 1868)..............26

Privy Council to the Earl of Carlisle (July 30, 1714), in Historical Manuscripts Commission, Tenth Report, Appendix, Part IV (1885)..................................................................22

Robert Gardiner, *The Compleat Constable* (3d ed. 1708) .......................22

*State Convention of the Suffrage Men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1 .................................................29

Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.)............................23

Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* 65-66 (New Haven, Oliver Steele 1816) ...............................................................................31

Theodore Barlow, *The Justice of Peace* 367 (1745) ................................23

W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721) ..................................................................................23

William Waller Hening, *The New Virginia Justice* 18 (1795)
(Va.) ...................................................................................................25

## Jurisdiction

This appeal arises from a district court's final judgment in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. The defendant filed a timely notice of appeal. (ROA.182.) This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

Cordova was convicted of violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms. Is his conviction valid under the Second Amendment?

## Statement of the Case

In January 2024, officers saw Cordova, a twice-convicted felon, pull up to house known for drug distribution. (ROA.251-52, 273.) Cordova's passenger went inside for a short period of time and quickly returned to Cordova's truck. (ROA.252, 273.) Soon thereafter, officers pulled Cordova over for a traffic violation. (ROA.252, 273.) Cordova had no identification, and when asked about the house, he told officers he was just picking up his friend. (ROA.252, 273-74.) Officers confronted Cordova about the lie and asked for permission to search the truck. (ROA.252, 274.) Cordova refused, but after officers warned that they intended to conduct a canine open-air sniff, he admitted he had a firearm in the truck. (ROA.252, 274.) The canine alerted, and inside the truck, officers found a loaded handgun under the driver's seat. (ROA.252, 274.) They also located a digital scale

1

and an unused hypodermic syringe in the back seat area, where another passenger sat. (ROA.274.)

Cordova admitted he had two prior felony convictions—one for possession of marijuana weighing less than 5 pounds but more than 4 ounces and another for evading arrest or detention with a motor vehicle. (ROA.251, 274, 276-77.) He also told officers that he and his passengers went to the drug house to "score" but had been unsuccessful, and that he had been using drugs, including marijuana and methamphetamine, for eight months. (ROA.274, 280.) He further told the officers that "[b]oth DAs will be happy" and that they all know who he is, and then he asked for his attorney. (ROA.274.)

Cordova was charged with unlawful possession of a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). (ROA.24, 273.) He moved to dismiss the indictment, claiming that § 922(g)(1) violates the Second Amendment. (ROA.37.) The district court denied the motion (ROA.93-94), and Cordova pleaded guilty to the indictment without a written plea agreement. (ROA.273.)

At sentencing, the district court applied a four-level enhancement because Cordova possessed the firearm in connection with another felony offense. (ROA.229-30 (overruling defendant's objections).) After all, Cordova admitted that he went to the drug house to "score" and officers found a digital scale and an unused hypodermic needle in the truck. (ROA.274.) Cordova also lost his acceptance of responsibility because he

was found in possession of, and admitted to using, synthetic marijuana while on pretrial release. (ROA.274-75; ROA.229-30 (overruling defendant's objections).) The district court then sentenced Cordova to a within-guidelines-range sentence of 34 months' imprisonment. (ROA.186, 282.)

Cordova now appeals his conviction only. (ROA.182.)

## Summary of the Argument

Cordova's conviction under § 922(g)(1) satisfies the Second Amendment. Applying § 922(g)(1) to a criminal defendant must comport with the principles that underpin our tradition of firearm regulation. Accordingly, this Court must consider the historical evidence, "taken together," to discern those principles and determine whether § 922(g)(1), as applied to Cordova, is consistent with them.

Applying that approach here reveals two aspects of our regulatory tradition that, taken together, support applying § 922(g)(1) to Cordova. First, our historical tradition supports disarming those who commit serious crimes, particularly those that would have triggered serious and permanent punishment like death at the founding. Cordova has been convicted of felony drug possession, which is analogous to capital founding-era crimes punishing receipt, possession, and trafficking in illicit contraband. Second, our historical tradition supports disarming those who pose a special danger of misusing firearms. Cordova's criminal record, which includes felony drug possession and evading arrest with a vehicle, identifies him as someone who poses a special danger of misusing firearms. Thus, our historical tradition supports disarming him.

## Standard of Review

This Court "review[s] preserved challenges to the constitutionality of a criminal statute de novo." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014).

4

**Arguments**

**Cordova's conviction under § 922(g)(1) comports with the Second Amendment.**

Consistent with the principles underpinning our Nation's historical tradition of firearm regulation, § 922(g)(1) can be constitutionally applied to Cordova, who has committed serious crimes and presents a special danger of misusing firearms.

**I.** ***Rahimi* clarified that the analytical framework governing Second Amendment challenges is a principles-based approach.**

In *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the Supreme Court held both that the Second Amendment protects an individual right to possess firearms and that this right is "not unlimited." In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022), the Supreme Court explained further how to determine when a law comports with that limited right: If the "plain text" of the Amendment "covers an individual's conduct," the regulation must be "consistent with this Nation's historical tradition of firearm regulation."

In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court applied this historical-tradition test to uphold 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms by individuals subject to certain domestic violence restraining orders. The Court explained that, since *Bruen,* "some courts have misunderstood the methodology of [the Supreme Court's] recent Second Amendment cases," which "were not meant to suggest a law trapped in amber." *Id.* at 1897.

The Court emphasized that the "appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," and that those principles "permit[] more than just regulations identical to ones that could be found in 1791." *Id.* at 1897-98. Section 922(g)(8), the Court held, is consistent with the principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901.

As evidence of that historical principle, the Court relied upon "two distinct legal regimes," "[t]aken together": surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and "going armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id.* at 1899-1901. The Court recognized that § 922(g)(8) is "by no means identical to these founding era regimes" but held that "it does not need to be." *Id.* at 1901. Instead, it was sufficient that the prohibition "is 'relevantly similar'" to historical laws "in both why and how it burdens the Second Amendment right." *Id.* (quoting *Bruen*, 597 U.S. at 29). As to why, both the modern law and its historical antecedents regulate "individuals found to threaten the physical safety of another." *Id.* As to how, surety and going armed laws, like § 922(g)(8), "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1902. The Court further emphasized that

"the penalty" for violating historical "going armed laws" included "imprisonment." *Id.* And "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.*

## II. Applying *Rahimi*'s principles-based approach, this Court upheld § 922(g)(1) facially and as applied to a convicted car thief.

In *United States v. Diaz*, this Court applied *Rahimi*'s principles-based approach to evaluate a challenge to § 922(g)(1). 116 F.4th 458 (5th Cir. 2024). This Court held that applying § 922(g)(1) to Diaz—a convicted car thief—"fit[] neatly" within the principles represented by two aspects of our tradition "taken together": (1) "serious and permanent punishment" for certain crimes and (2) "[i]mposing permanent disarmament as a punishment" for crime. *Id.* at 467-72 (quoting *Rahimi*, 144 S. Ct. at 1901).

As to the first tradition, this Court began by noting that Diaz had a previous felony theft conviction and that numerous colonial-era laws "severely punish[ed] people like Diaz who had been convicted of theft," often with death. *See id.* at 468-69. The Court stressed that these capital-punishment laws had a purpose ("why") relevantly similar to § 922(g)(1)'s: They sought to "deter violence and lawlessness," even if they

took a more absolute approach to that goal than § 922(g)(1)'s relatively modest prohibition on gun possession. *See id.* at 469.

The Court also explained that founding-era capital punishment laws and § 922(g)(1) accomplished that purpose ("how") in relevantly similar ways: Both laws permanently punished offenders as a result of their serious crime. *See id.* ("As to the 'how,' these laws achieved their goals by permanently punishing offenders, as does § 922(g)(1). Capital punishment is obviously permanent, and the majority of the estate forfeiture laws that the government cites did not provide an opportunity for offenders to regain their possessions."). In making this comparison, the Court rejected Diaz's claim that capital punishment laws were too dissimilar to modern gun restrictions to be used as a historical analogy. *See id.* "Here, if capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." *Id.*

The Court further relied on "firearm-focused evidence" that our historical tradition includes permanent disarmament as punishment for crime. *Id.* at 470-71. The Court noted two relevant proposals from state constitutional conventions: a speech from a minority group in Pennsylvania and an amendment offered by Samuel Adams of Massachusetts. *Id.* at 470. The "'highly influential'" Pennsylvania address "suggested that citizens have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.'" *Id.* at 470

(quoting *Heller*, 554 U.S. at 604, and Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). "Massachusetts's proposed amendment said that the Constitution authorized 'the people of the United States, who are peaceable citizens, [to keep] their own arms.'" *Id.* (quoting Schwartz, *supra*, at 681). "[T]aken together with the other [historical] evidence," these proposals "reveal" a public understanding that the right to bear arms "was not unlimited," and that "the government could prevent people who had committed crimes or were 'quarrelsome' from accessing weapons." *Id.*

The Court also cited "going armed" laws common to the founding era, which authorized permanent dispossession of firearms for people who carried them publicly in a threatening or offensive manner. *See id.* at 470-71. Again, the Court stressed that "going armed" laws and § 922(g)(1) could be relevantly similar without being exact matches; what mattered was the broad principle behind the historical laws, not their exact contours or enforcement mechanisms. *See id.* at 471 (noting that "going armed" laws sought to punish those whose conduct "disrupted the public order," and "led almost necessarily to violence" (internal quotation marks and alterations omitted)); *id.* ("Going armed laws are relevant historical analogues to § 922(g)(1), just as *Rahimi* found them to be with respect to § 922(g)(8).").

Having surveyed this historical evidence, the Court rejected Diaz's as-applied challenge, holding that disarming Diaz "fit[] neatly" within

our historical tradition of regulating firearms. *See id.* at 471 ("Taken together, laws authorizing severe punishments for thievery and permanent disarmament in other cases establish that our tradition of firearm regulation supports the application of § 922(g)(1). Diaz's Second Amendment claim fails." (internal citation and quotation marks omitted)). The failure of Diaz's "as-applied" claim also doomed his facial challenge, since it established that § 922(g)(1) is constitutional in at least some of its applications. *Id.*

## III.  History and tradition support Cordova's § 922(g)(1) conviction, too.

As a threshold matter, the United States maintains that felons are not among "the people" protected by the Second Amendment and that, consistent with this Nation's historical tradition, § 922(g)(1) is constitutional in all its applications. *See* Petition for a Writ of Certiorari, *Garland v. Range*, No. 23-374, 2023 WL 6623648, at *7-22 (U.S. Oct. 5, 2023). The United States recognizes that *Diaz* forecloses these "preliminary defenses." 116 F.4th at 465-68.

*Rahimi*'s principles-based approach demands dismissal of Cordova's as-applied claim. Two principles emerge from our regulatory tradition, both of which support the application of § 922(g)(1) to Cordova. First, as this Court made clear in *Diaz*, legislatures may permanently disarm those who commit serious crimes, including crimes that carried serious and permanent punishment at the founding. Second, legislatures

may disarm those whose criminal history establishes a special danger of misusing firearms. Applying § 922(g)(1) to dangerous criminals like Cordova is consistent with these principles and the "relevantly similar" laws that represent them. Accordingly, this Court should affirm.[1]

**A.** **Applying § 922(g)(1) to Cordova is consistent with this Nation's tradition of disarming individuals who commit serious crimes, including crimes that carried serious and permanent punishment at the founding.**

As explained above, this Court in *Diaz* discerned a tradition of severely and permanently punishing people for certain crimes, including theft, and reasoned that those punishments necessarily subsumed disarmament. 116 F.4th at 467-70. Indeed, capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century. *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)); *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (same). And "death . . . was the standard penalty for all serious crimes." *Diaz*, 116 F.4th at 467

---

[1] Cordova complains that the Government failed to present any historical analogues in response to his motion to dismiss and the district court cited none in its order denying the motion. Def. Br. 9. But the district court, relying on then-binding precedent, denied Cordova's motion on the day it was filed, leaving the Government neither the opportunity nor the need to file a response. (ROA.37, 93.) In any event, this Court has held that "the Second Amendment analysis is a legal inquiry into the text and history related to the relevant regulation," and thus, "the government may provide"—and this Court may consider—"additional legal support for its arguments on appeal." *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024). Further, this Court may affirm the ruling below on any ground supported by the record. *See Buchholz v. Crestbrook Ins. Co.*, 65 F.4th 766, 771 (5th Cir. 2023)

(internal quotation marks omitted); *see Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death"). "Colonies and states also routinely made use of estate forfeiture as punishment." *Diaz*, 116 F.4th at 467; *see also United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024) ("[E]arly legislatures . . . authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for nonviolent offenses involving deceit and wrongful taking of property." (collecting statutes and scholarship)); Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-76 (2014) (collecting statutes).

These punishments often applied to nonviolent crimes, including crimes that involved knowingly receiving, possessing, or trafficking in contraband like stolen goods or forged documents. For example, in the founding era, the knowing receipt of a stolen horse was punishable by death. *See also* 6 William Waller Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619, page 130 (1819) (1748 law) (punishing knowing receipt of stolen horse with death). The Second Congress meted out the same punishment for theft of mail. An Act to Establish the Post Office and Post Office and Post Roads within the United States, § 17, 1 Stat. 232, 237 (1792). And both state and federal legislatures punished counterfeiting and forgery of public securities with death or estate forfeiture. *See* An Act for the Punishment of Certain Crimes Against the

United States, 1 Stat. 112, 112-15 (1790) (making it a felony to forge or counterfeit a public security); 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 664-65 (1886) (1788 law) (punishing counterfeiting with death); 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 260-61 (1886) (1786 law) (punishing counterfeiting bills of credit with estate forfeiture); 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821) (1777 law) (imposing estate forfeiture on anyone convicted of forging, counterfeiting, or knowingly presenting for payment a wide range of forged documents).[2]

These laws, taken together, establish a historical tradition of severely punishing people convicted of crimes involving the creation, possession, or distribution of illicit goods. Like § 922(g)(1), they severely and indefinitely punished knowing participants in illicit marketplaces to deter crime and protect society from lawlessness. *See Diaz*, 116 F.4th at 468-69. These punishments extended not just to those who created or

---

[2]    *See also* 1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811) (1715 law) (imposing estate forfeiture on anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance); Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767) (1743 law) (imposing death penalty on any person convicted of forging or counterfeiting bills of credit and estate forfeiture on any person knowingly passing a counterfeit bill).

stole the illicit goods but also to those who knowingly received, possessed, used, or distributed them. And the punishment imposed subsumed disarmament rendering the means to achieve these goals "relevantly similar" to § 922(g)(1).

Punishing Cordova with disarmament for possessing illicit goods fits within this tradition of serious and permanent punishment. Cordova, just like those punished at the founding for receiving or possessing stolen horses, stolen mail, and counterfeits, has advanced the sort of trafficking in illicit goods—here, possessing somewhere between five pounds and four ounces of marijuana—that legislatures have tried to restrict. (ROA.251.)

Cordova argues that the lack of drug regulation in colonial-era America precludes consideration of his predicate drug offense. Def. Br. 14 (citing *United States v. Connelly*, 117 F.4th 269, 279 (5th Cir. 2024)). But *Diaz* does not require a one-for-one historical analogue mirroring a defendant's modern-day conviction. *See id.* at 467 (noting that the government need not identify "'a historical twin'") (quoting *Bruen*, 597 U.S. at 30); *Rahimi*, 144 S. Ct. at 1897-98 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."). And in recent cases analyzing the constitutionality of § 922(g)(1), this Court looked beyond the formal elements of the crime the defendant had committed to the details of *how* that defendant had committed the crime. *United States v. Contreras*, 125 F.4th 725, 732 (5th

14

Cir. 2025) (explaining that the defendant there had been intoxicated while carrying a firearm); *United States v. Bullock*, 123 F.4th 183 (5th Cir. 2024). Here, the founding-era analog to a person convicted of illegally possessing or trafficking drugs is a person convicted of possessing or trafficking contraband.

Moreover, just because founding-era legislatures did not punish particular conduct—especially conduct reflecting dangers more prevalent today, like possessing marijuana—does not mean they would have considered such punishment inconsistent with the Second Amendment. *Rahimi*, 144 S. Ct. at 1905, 1925 (Sotomayor & Barrett, JJ., concurring). Rather, the "appropriate analysis" requires this Court to consider the historical evidence "taken together" to discern broad "principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898, 1901.

Of course, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at 1926 (Barrett, J., concurring). But the appropriate analysis still focuses on broader principles, rather than an exacting one-to-one comparison. *Id.* at 1925 (Barrett, J., concurring). Moreover, "a test that demands overly specific analogues" would result in a "'law trapped in amber'" by "forc[ing] 21st-century regulations to follow late-18th-century policy choices." *Id.* Such a test would also wrongly "assume[] that founding-era legislatures maximally exercised their power to regulate." *Id.* The *Rahimi* majority rejected that incorrect view of legislative authority, holding that "the

15

appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898 (majority opinion).

Applying that analysis here reveals a broad tradition of disarming individuals for committing serious crimes like possessing, receiving, and trafficking in illicit goods. And applying § 922(g)(1) to Cordova—who stands convicted of felony drug possession and evading arrest in a vehicle—is "relevantly similar" to the tradition these laws represent. *See Diaz*, 116 F.4th at 469, 472.

### B. Applying § 922(g)(1) to Cordova is consistent with our history of disarming those who present a special danger of misusing firearms.

The historical record also establishes a tradition of disarming individuals whose past criminal conduct demonstrates a special danger of misusing firearms—further showing that § 922(g)(1) is constitutional as applied to Cordova.

### 1. Our tradition supports the principle that those who present a special danger of misusing firearms may be constitutionally disarmed.

As this Court and other Circuits have recognized, "[t]he historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.'" *Bullock*, 123 F.4th at 185 (quoting *Kanter v. Barr*, 919 F.3d 437, 451-64 (7th Cir. 2019) (Barrett, J., dissenting)); *see also United States v. Hunt*, 123 F. 4th 697, 706 (4th Cir.

2024) ("Legislatures [have historically] had the ability to disarm particular people to address a risk of dangerousness, which readily attaches to people who have already been found guilty of having broken the law.") (cleaned up); *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024) (finding a historical tradition of "disarm[ing] groups of people, like felons, whom the legislature believes to be dangerous"); *Jackson*, 110 F.4th at 1128 ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed.").[3] This consensus is supported by ample historical evidence from English and colonial history, the ratification debates, and the period after the founding.

English History. The Second Amendment "was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599. And the English right was not understood to prevent the disarming of dangerous people. In England, the 1662 Militia Act empowered the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car.

---

[3]     *See also Folajtar v. Attorney General*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) ("English and early American laws disarmed the dangerous." (italics omitted)); *Binderup v. Attorney General*, 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public."), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

2, c. 3, § 13 (Eng.). Parliament subsequently recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Id.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Id.*

While condemning the disarming of "good subjects," the English Bill of Rights allowed the disarming of irresponsible or dangerous ones. It did not displace the 1662 Militia Act, the use of which "continued unabated" after the adoption of the English Bill of Rights in 1689. Diarmuid F. O'Scannlain, "Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms," 95 *Notre Dame L. Rev.* 397, 405 (2019).[4] Indeed, many 18th-century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[5]

---

[4] *See, e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700 - 8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); *Privy Council to the Earl of Carlisle* (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

[5] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a*

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S. Ct. at 2139-42. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the weapons.[6] And even at the time of the American Revolution, the English Bill of Rights was understood to allow disarming irresponsible and non-peaceable subjects. In 1780, after London officials responded to widespread rioting by confiscating rioters' arms, the House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-32 (1994). Because the English right is "the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, this history provides "distinctly similar" analogues to § 922(g)(1) as applied to those who are not law-abiding citizens, including dangerous felons. *Bruen*, 142 S. Ct. at 2131.

The Supreme Court in *Rahimi* relied on these historical "going armed" laws to discern a tradition of "disarm[ing] individuals who present a credible threat to the physical safety of others." 144 S. Ct. at

---

*Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[6] *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1st ed. 1767); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

1902. This Court looked to these same laws in *Diaz* to discern a tradition of disarming those "who had committed crimes or were quarrelsome." 116 F.4th at 470-71.

Early American History. American colonies—and later states—also quickly developed a tradition of disarming those who were considered dangerous. Early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 30 U.S. (5 Pet.) 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[7] Some 17th- and 18th-century American statutes expressly recodified that rule.[8] Other laws called for case-by-case judgments about dangerousness. *See, e.g.*, Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90 (empowering officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the

---

[7] *See, e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, or the American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[8] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force* 33 (1794).

Arms, Accoutrements and Ammunition which they own or possess"). Still others made forfeiture part of the penalty for offenses such as unsafe storage of guns or gunpowder.[9] Although those laws concerned forfeiture of arms involved in an offense, rather than bans on possessing arms, they show that legislatures could restrict an individual's ability to bear arms if his conduct suggested that his possession of firearms would endanger others.

Ratification Debates. Precursors to the Second Amendment proposed at the state ratifying conventions for the Constitution also indicate that, under the historical understanding of the right to bear arms, legislatures could disarm lawbreakers and those who were dangerous. A proposed bill of rights presented at the Pennsylvania ratifying convention stated that "no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals.*" 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which proved "highly influential" on the Bill of Rights. *Heller*, 554 U.S. at 604.

---

[9] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674,* at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001).

Although those precursors used different language from the Second Amendment, they shed light on its meaning. *See Heller*, 554 U.S. at 604. The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-05. Judge Barrett agreed that the Pennsylvania and Massachusetts proposals are "evidence of the scope of founding-era understandings," and show that "threatened violence and the risk of public injury . . . animated English and early American restrictions on arms possession." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

This Court held so, too. *See Diaz*, 116 F.4th at 471. Though this Court found it "dubious" to "rely[] *solely* on these types of unadopted proposals," "taken together with the other evidence," "they do help to

illuminate the 'public understanding' of the Second Amendment around the time of its ratification." *Id.* at 470 (emphasis added). Under this common conception, the government may disarm lawless and dangerous people, just as § 922(g)(1) does as applied to Cordova. *See id.* at 470-71 (finding a historical tradition of disarming those who had committed crimes or were unpeaceable).

Post-Founding. Post-ratification commentators and legislative enactments confirm this understanding of the Second Amendment. For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage Men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime, in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

In the 1800s, states began to adopt surety statutes that required certain potentially irresponsible people who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by

Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions later adopted variants of that law. *See Bruen*, 142 S. Ct. at 2148 n.23. These firearm-specific surety laws built upon a surety tradition that existed at common law, *see* 4 William Blackstone, *Commentaries on the Laws of England* 252 (1st ed. 1769), was codified by some colonies in the 1700s,[10] and was commonplace immediately after the founding.[11] While surety statutes did not categorically disarm individuals with a prior conviction, they reinforce the historical tradition of disarming dangerous persons. *Rahimi*, 144 S. Ct. at 1900 ("[T]he surety laws [] targeted the misuse of firearms" and "provided a mechanism for preventing violence before it occurred.").

As the 19th century wore on, guns became more lethal and more widely available. Guns in the 18th century generally fired only one shot, often misfired, took a long time to load, and could not be kept loaded for long periods. Randolph Roth, "Why Guns Are and Are Not the Problem,"

---

[10]     *See* Act About Binding to the Peace, ch. 26, 1700 Pa. Laws 5; Act About Binding to the Peace, ch. 4, 1700 Del. Laws 52; 1702 Conn. Acts 91; Act Declaring the Mode of Proceeding in Certain Criminal Cases, ch. 30, § 16, 1789 Va. Laws 17-18.

[11]     *See State v. Davis*, 5 S.C.L. (3 Brev.) 3, 4 (S.C. Const. Ct. App. 1811); *Respublica v. Donagan*, 2 Yeates 437 (Pa. 1799); Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* 65-66 (New Haven, Oliver Steele 1816).

*in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). But technological developments in the 1800s—such as metallic cartridges, mass-produced revolvers, and guns capable of firing multiple shots—led to the increased use of guns in homicides. *Id.* at 123-27. During this time, legislatures disarmed a range of people they deemed unfit to carry firearms, including those below certain ages,[12] those of

---

[12]    *See* Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716; Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140; Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.).

unsound mind,[13] vagrants,[14] and intoxicated persons.[15]

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with firearms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900). Thus, even if these statutes did not specifically disarm felons, they "impose a comparable burden" on the right to arms and are "comparably justified" by the interest in protecting society against dangerous persons. *Bruen*, 142 S. Ct. at 2133.

---

[13]    *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[14]    *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[15]    *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879).

Legal sources in the aftermath of the Civil War also reflected the historical understanding that dangerous individuals could be disarmed. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," but that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866). Around the same time, the Freedman's Bureau explained that a person "may be disarmed if convicted of making an improper or dangerous use of weapons." *Bruen*, 142 S. Ct. at 2152 (quoting *The Loyal Georgian*, Feb. 3, 1866, p. 3, col. 4). All these sources suggest that the Government may properly disarm citizens who have been convicted of a dangerous offense.

Indeed, this Court relied on many of these same laws in *Diaz* to discern a tradition of permanent disarmament for crime. 116 F.4th at 470-71 (relying on "going armed" laws and the Second Amendment precursors from the ratification debates, among other evidence). Other courts analyzing this evidence have similarly found a tradition of disarming the dangerous. *See, e.g.*, *Hunt*, 123 F. 4th at 707-08 (rejecting § 922(g)(1) as-applied challenge based on a historical tradition of disarming the dangerous); *Williams*, 113 F.4th at 663 (finding historical tradition "disarm[ing] groups of people, like felons, whom the legislature believes to be dangerous"); *Jackson*, 110 F.4th at 1126-28 ("Legislatures historically prohibited possession by categories of persons based on a

27

conclusion that the category as a whole presented an unacceptable risk of danger if armed.").

**2. Cordova's criminal record shows that he presents a special danger of misusing firearms.**

Cordova's record of evading arrest with a vehicle and felony drug possession, especially when considered in conjunction with his regular drug use and offense conduct (i.e., bringing a firearm to an attempted drug purchase), underscores the special danger he presents when armed.

First, Cordova stands convicted of felony drug possession. In 2013, he was convicted of possessing five pounds or less but more than four ounces of marijuana in a drug free zone. (ROA.251.) At the time, Cordova was serving a five-year term of deferred adjudication for using a vehicle to evade a police officer attempting to detain and arrest him. (ROA.276.) The court revoked his deferred adjudication due to his new offense and marijuana use and sentenced him to three years of probation. (ROA.276.) And in the instant case, Cordova was attempting to obtain illegal drugs at the time of his arrest. (ROA.274.) He also admitted to a long history of regular substance abuse. (ROA.274, 280.) For example, Cordova reported using alcohol and marijuana every day for more than a decade and using methamphetamine every other day for the past several years. (ROA.280.) He also admits to having previously used cocaine base weekly and cocaine biweekly for a period of years. (ROA.280.)

Cordova's prior felony drug possession conviction and repeated drug use show that he presents a special danger of possessing firearms. His illegal drug use necessarily requires interacting with drug traffickers and participating in an illicit marketplace. Drug trafficking crimes "pose a significant threat of danger" and put people's "safety at risk," even if they "do not always involve an immediate and direct threat of violence." *Williams*, 113 F.4th at 659.[16] Drug traffickers are apt to use firearms "to protect drug stockpiles, to preempt encroachment into a dealer's 'territory' by rival dealers, and for retaliation." *United States v. Luciano*, 329 F.3d 1, 6 (1st Cir. 2003); *see Smith v. United States*, 508 U.S. 223, 240 (1993) ("[D]rugs and guns are a dangerous combination.").

Statistical evidence confirms that those convicted of drug offenses are likely to commit violence in the future. A 2021 study found that 73% of drug traffickers were re-arrested within five years of their release from state prison.[17] Many of those arrests were for violent offenses. Of those originally arrested for drug-related offenses (not limited to drug

---

[16]    *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting) ("[D]rug dealing [is] not necessarily violent," but it is "dangerous because [it] often lead[s] to violence."); *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011) ("[O]ffenses relating to drug trafficking . . . are closely related to violent crime."); *United States v. Garcia*, 797 F.3d 320, 321 (5th Cir. 2015) (noting correlation between violence and drug crimes in the context of a guidelines enhancement).

[17]    Bureau of Justice Statistics, "Recidivism of Prisoners Released in 24 States in 2008: A 10-Year Follow-Up Period (2008-2018)," at 5 (Table 5), https://bjs.ojp.gov/ BJS_PUB/rpr24s0810yfup0818/Web% 20content/508% 20compliant% 20PDFs (accessed Dec. 14, 2023).

trafficking), 34.8% were re-arrested within ten years for violent crimes such as homicide (1.1%), robbery (6.2%), and assault (27.7%).[18] Thus, past drug convictions—even those for simple possession—are indicative of future dangerousness.

Cordova's felony conviction for evading arrest with a vehicle likewise indicates dangerousness and lawlessness. Under Texas law, evading arrest with a vehicle qualifies as a state jail felony subject to a statutory maximum penalty of two years' imprisonment. Tex. Penal Code § 38.04. The intent of the Texas statute "is to deter flight from arrest or detention by the threat of an additional penalty, thus discouraging forceful conflicts between the police and suspects." *Duvall v. State*, 367 S.W.3d 509, 513 (Tex. App.—Texarkana 2012, pet. ref'd). Evading arrest with a vehicle threatens the physical safety of law enforcement officers, the public at large, and offenders themselves—precisely the type of conduct that justifies disarmament.

Finally, this Nation has a historical tradition of severely punishing repeat offenders. *See, e.g.*, Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664-65 (authorizing death penalty for second felony conviction); Act of June 14, 1701, ch. 7, 1702 Laws of New Hampshire 678, 794 (authorizing death penalty for second burglary offense). And "numerous studies" show a "link between past criminal conduct and future crime, including gun

---

[18]     *Id.* at 10 (Table 11).

violence." *Binderup*, 836 F.3d at 400 (Fuentes, J., concurring in part and dissenting in part).

Here, officers found Cordova in possession of a firearm while attempting to purchase drugs from a known drug house. (ROA.273-74.) Cordova committed the offense despite having previously been convicted of illegal drug possession and evading arrest with a vehicle. Cordova also admits to regularly using marijuana and methamphetamine up until the time of his arrest. (ROA.280.) Permanently disarming him fits neatly within our historical tradition of severe and permanent punishment for repeat offenders and individuals who pose a serious risk of misusing firearms.

Cordova's counterarguments do not undermine this conclusion. First, Cordova relies heavily on the Third Circuit's opinion in *Range v. Attorney General*, 124 F.4th 218 (5th Cir. 2024), which held that § 922(g)(1) cannot be constitutionally applied to a plaintiff who had been convicted of food-stamp fraud two decades before he brought an as-applied challenge in a preemptive, pre-enforcement civil suit. In reaching this conclusion, the court found no evidence that the plaintiff was a danger to others and found no longstanding history and tradition of depriving people like him of firearms. *Id.* at 230-32. But the Court acknowledged its opinion was narrow. *Id.* at 232.

Unlike Range, Cordova has two prior felony convictions—one for possessing illicit drugs and another for evading arrest—and his current

offense involved bringing a loaded firearm to a drug deal. These facts also sharply contradict Cordova's contention that "there is no indication that the firearm's mere presence with him was in furtherance of any violent intent or something that would be 'legitimately dangerous' to the public." Def. Br. 16. Again, courts have long recognized the dangerous correlation between drugs and guns, and bringing a loaded firearm to a drug house undoubtedly heightens the danger of the already-criminal activity. Indeed, at sentencing, the district court applied a four-level enhancement because Cordova possessed the firearm in connection with another felony offense. (ROA.229-30 (overruling defendant's objections).)

Likewise, this Court should reject Cordova's suggestion that the Government must show evidence that Cordova's felony convictions were punishable by lifetime disarmament, death, or estate forfeiture at the founding. Def. Br. 14-15. Such a showing would be sufficient but is not required by *Diaz*. *See* 116 F.4th at 469-70 (explaining that "[w]e could stop here," after finding that theft was a felony at the founding and subject to "capital punishment or estate forfeiture"); *see id.* at 467 (noting that the government need not identify "'a historical twin'" (quoting *Bruen*, 597 U.S. at 30)). To hold otherwise would be tantamount to requiring a historical twin, a standard the Supreme Court has disclaimed. *Rahimi*, 144 S. Ct. at 1897-98 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be

found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

Rather, "the appropriate analysis" requires this Court to consider the historical evidence "taken together" to discern the "principles that underpin our regulatory tradition" and consider whether the challenged regulation is consistent with those principles. *Id.* at 1898, 1901. As Justice Barrett explained in concurrence, "[h]istorical regulations reveal a principle" that can then be applied to modern regulations. *Id.* at 1925 (Barrett, J., concurring). One of those "principles underlying the Second Amendment," *Rahimi* determined, is that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1898, 1901 (majority opinion).

Our nation has a long tradition of disarming those who commit serious crimes and pose a special danger of misusing firearms. And applying § 922(g)(1) to Cordova, who has been convicted of felony drug possession and evading arrest with a vehicle, fits neatly within that tradition. Accordingly, this Court should affirm.

## Conclusion

For these reasons, this Court should affirm the defendant's judgment of conviction.

Respectfully submitted,

Margaret Leachman
Acting United States Attorney

/s/ *Lauren Tanner Bradley*
By:         Lauren Tanner Bradley
Assistant United States Attorney

## Certificate of Service

On March 13, 2025, I filed this brief through this Court's electronic case-filing system, which will serve it on all registered counsel, including the defendant-appellant's counsel.

/s/ *Lauren Tanner Bradley*
Lauren Tanner Bradley
Assistant United States Attorney

## Certificate of Compliance

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), excluding the parts of the brief exempted by Rule 32(f), because it contains **8,344** words.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

/ s/ *Lauren Tanner Bradley*
Lauren Tanner Bradley
Assistant United States Attorney