No. 24-50564

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff–Appellee,*

v.

PETER VILLA CORDOVA,
*Defendant–Appellant.*

On Appeal from the United States District Court
for the Western District of Texas – Midland/Odessa Division
USDC No. 7:24-CR-31-1

# APPELLANT'S EN BANC BRIEF

**Lane A. Haygood**
Texas State Bar No. 24066670
HAYGOOD LAW FIRM
620 N. Grant Ave., Suite 913
Odessa, Texas 79761
Tel: (432) 279-0411
lane@haygoodlawfirm.com

*Counsel for Defendant–Appellant*

# CERTIFICATE OF INTERESTED PERSONS

**No. 24-50564, *United States v. Cordova***

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. United States of America, Plaintiff–Appellee.
2. Peter Villa Cordova, Defendant–Appellant.
3. Lane A. Haygood, Counsel for Defendant–Appellant.
4. Lauren Tanner Bradley, Zachary Carl Richter, and William A. Glaser, Counsel for Plaintiff–Appellee.

/s/ Lane A. Haygood
**Lane A. Haygood**
*Counsel for Defendant–Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

The Court has ordered that this case "be reheard by the court en banc with oral argument on a date hereafter to be fixed." Order of Sept. 14, 2026. The Court's en banc session notice lists the case for the January 2027 sitting.

Mr. Cordova agrees that argument will aid the Court. The case asks the full Court to decide what a court may consider in an as-applied challenge to 18 U.S.C. § 922(g)(1), who bears the burden, and whether the Second Amendment permits lifetime disarmament on the basis of convictions like Mr. Cordova's. Its panels have divided on the first of those questions. The Supreme Court's intervening decisions in *United States v. Hemani*, 608 U.S. 772 (2026), and *Wolford v. Lopez*, 609 U.S. 185 (2026), bear on each.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........ i
STATEMENT REGARDING ORAL ARGUMENT ........ ii
TABLE OF AUTHORITIES ........ v
INTRODUCTION ........ 1
JURISDICTIONAL STATEMENT ........ 4
STATEMENT OF THE ISSUE ........ 5
STATEMENT OF THE CASE ........ 6
A. Mr. Cordova's prior convictions ........ 6
B. The charged conduct and the motion to dismiss ........ 8
C. The panel decision ........ 10
D. Rehearing en banc ........ 11
SUMMARY OF THE ARGUMENT ........ 13
STANDARD OF REVIEW ........ 16
ARGUMENT
I. The Second Amendment presumptively protects Mr. Cordova, and the Government bears the burden of justifying his disarmament. ........ 17
A. Mr. Cordova is among "the people." ........ 17
B. The Government must show that disarming Mr. Cordova fits the Nation's historical tradition in both purpose and operation. ........ 18
C. *Hemani* reserved § 922(g)(1), and its reasoning supports Mr. Cordova. ........ 20
II. The Court should reject the Government's categorical rule. ........ 22
A. The Government may not disarm a class by calling it dangerous. ........ 22
B. Founding-era capital punishment does not establish a tradition of lifetime disarmament for every felony. ........ 29
C. The Government's remaining sources do not show a tradition of disarming all felons. ........ 32
D. Section 925(c) does not cure the problem. ........ 33
III. The as-applied inquiry asks what the predicate conviction establishes, and the Government bears the burden. ........ 36

A. The statute and the Constitution both make the conviction the measure. .......... 37
B. A whole-record inquiry gives no notice, justifies disarmament after the fact, and cannot be administered. .......... 40
C. The burden stays with the Government. .......... 42
D. If the Court adopts a broader dangerousness inquiry, the inquiry must carry the safeguards that history required. .......... 42
IV. The Government has not shown that Mr. Cordova's convictions support disarming him. .......... 44
A. Possession of marijuana does not .......... 44
B. Evading arrest or detention with a vehicle does not. .......... 45
C. Uncharged conduct and the circumstances of the arrest are irrelevant to the constitutional question. .......... 53
V. Even if some disarmament were justified, the Government has not shown a tradition of disarming a person like Mr. Cordova for life. .......... 55
A. Duration is part of what the Government must justify. .......... 55
B. The historical practices were temporary or took only property. .......... 56
C. Mr. Cordova completed his sentence in 2017 .......... 58
D. The question is properly before the en banc Court. .......... 58
VI. The Court should reverse and direct dismissal of the indictment or, at a minimum, vacate and remand. .......... 60
CONCLUSION .......... 62
CERTIFICATE OF SERVICE .......... 63
CERTIFICATE OF COMPLIANCE .......... 64

# TABLE OF AUTHORITIES

## Cases

*Class v. United States*, 583 U.S. 174 (2018) .......... 16

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......... 17, 20, 26

*Drichas v. State*, 175 S.W.3d 795 (Tex. Crim. App. 2005) .......... 46

*Johnson v. United States*, 576 U.S. 591 (2015) .......... 49

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .......... passim

*Lange v. California*, 594 U.S. 295 (2021) .......... 10, 47

*Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) .......... 59

*Logan v. United States*, 552 U.S. 23 (2007) .......... 34

*Mayfield v. State*, 219 S.W.3d 538 (Tex. App.—Texarkana 2007, no pet.) .......... 46

*New Orleans Depot Services, Inc. v. Director, OWCP*, 718 F.3d 384 (5th Cir. 2013) (en banc) .......... 60

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) .......... passim

*People v. Burns*, 2015 IL 117387, 79 N.E.3d 159 .......... 38

*Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025) .......... 42, 43

*Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024) (en banc) .......... passim

*Sykes v. United States*, 564 U.S. 1 (2011) .......... 49

*Tennessee v. Garner*, 471 U.S. 1 (1985) .......... 30

*United States v. Bean*, 537 U.S. 71 (2002) .......... 34, 35

*United States v. Bost*, No. 24-1719 (3d Cir. Oct. 13, 2026) (en banc) .......... passim

*United States v. Cockerham*, 162 F.4th 500 (5th Cir. 2025) .......... 23, 37, 61

*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024) .......... 25, 44

*United States v. Contreras*, 125 F.4th 725 (5th Cir. 2025) .......... 57

*United States v. Cordova*, 176 F.4th 381 (5th Cir. 2026) (per curiam), *reh'g en banc granted, opinion vacated* (5th Cir. Sept. 14, 2026) .......... passim

*United States v. Debrow*, 183 F.4th 402 (5th Cir. 2026) .................................. 40, 61

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) ......................................passim

*United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025) (en banc) .............. 27, 28, 47

*United States v. Flores*, 404 F.3d 320 (5th Cir. 2005) ........................................... 41

*United States v. Harrimon*, 568 F.3d 531 (5th Cir. 2009) ............................11, 46, 49

*United States v. Hemani*, 608 U.S. 772 (2026)..............................................passim

*United States v. Hembree*, 165 F.4th 909 (5th Cir. 2026) .....................38, 44, 45, 61

*United States v. Hernandez*, 159 F.4th 425 (5th Cir. 2025) (per curiam) ..............38

*United States v. Howard*, 766 F.3d 414 (5th Cir. 2014) .......................................... 16

*United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024)............................................27

*United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024) ................................. 27, 33

*United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025) .................................passim

*United States v. Levasseur*, No. 24-1687, 2026 WL 2731003 (1st Cir. Sept. 16, 2026) ...................................................................................... 28, 34

*United States v. Luna*, No. 25-40272, 2026 WL 2507689 (5th Cir. Aug. 25, 2026) ............................................................................... 24, 39, 44

*United States v. Mancilla*, 155 F.4th 449 (5th Cir. 2025)................................. 42, 43

*United States v. Mitchell*, 160 F.4th 169 (5th Cir. 2025) ............................18, 38, 61

*United States v. Mitchell*, No. 25-30438, 2026 WL 2507820 (5th Cir. Aug. 26, 2026)...................................................................................................56

*United States v. Rahimi*, 602 U.S. 680 (2024) ..............................................passim

*United States v. Reyes*, 141 F.4th 682 (5th Cir. 2025) (per curiam)...................... 48

*United States v. Richardson*, 188 F.4th 412 (D.C. Cir. 2026) ................................57

*United States v. Simpson*, 152 F.4th 611 (5th Cir. 2025) .................................. 10, 48

*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024).......................... 25, 34, 42

*Vincent v. Bondi*, 127 F.4th 1263 (10th Cir. 2025)..................................................27

*Williams v. Att'y Gen.*, No. 24-1091 (3d Cir. Oct. 13, 2026) (en banc)...........passim

*Wolford v. Lopez*, 609 U.S. 185 (2026) .......... passim

*Yee v. City of Escondido*, 503 U.S. 519 (1992) .......... 59

*Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025) .......... 27, 31

## Constitutional Provisions

U.S. Const. amend. II .......... passim

## Statutes

18 U.S.C. § 3142 .......... 41

18 U.S.C. § 3231 .......... 4

18 U.S.C. § 3563 .......... 41

18 U.S.C. § 3583 .......... 41

18 U.S.C. § 921(a)(20) .......... 23, 25, 52

18 U.S.C. § 922(g) .......... passim

18 U.S.C. § 924(a)(8) .......... 8, 30

18 U.S.C. § 924(c) .......... 41

18 U.S.C. § 924(e)(2)(B)(ii) .......... 49

18 U.S.C. § 925(c) .......... passim

28 U.S.C. § 1291 .......... 4

Act of Apr. 30, 1790, ch. 9, 1 Stat. 112 .......... 32, 51

Act of June 17, 2011, 82nd Leg., R.S., ch. 920, § 3, 2011 Tex. Gen. Laws 2321 .......... 52

Act of June 19, 2009, 81st Leg., R.S., ch. 1400, § 4, 2009 Tex. Gen. Laws 4385 .......... 6

Acts 1995, 74th Leg., R.S., ch. 708, § 1 .......... 52

Tex. Code Crim. Proc. art. 42A.054 .......... 46

Tex. Penal Code § 12.35 .......... 6, 52

Tex. Penal Code § 12.44 .......... 52

Tex. Penal Code § 38.04 .......... 6, 45, 46, 48

Tex. S.B. 215, 77th Leg., R.S. (2001) .......... 52

## Rules and Regulations

Fed. R. App. P. 4(b)(2) .......... 4

Fed. R. Crim. P. 12(b)(1) .......... 41

28 C.F.R. § 107.20 .......... 35

91 Fed. Reg. 54,054 (Aug. 20, 2026) .......... 34, 35

## Other Authorities

4 William Blackstone, Commentaries on the Laws of England (1769) .......... 51, 56

Application of 18 U.S.C. § 922(b)(1) and (c)(1) to Young Adults, 50 Op. O.L.C. ___ (Sept. 17, 2026) .......... 18, 23, 27

Brief for the United States, *United States v. Hemani*, No. 24-1234 (U.S. Dec. 12, 2025) .......... 36

Judgment Revoking Community Supervision and Adjudicating Guilt, *State v. Cordova*, No. CR38141 (142nd Dist. Ct., Midland County, Tex. May 8, 2014) .......... 6, 7, 46

Petition for a Writ of Certiorari, *United States v. Cockerham*, No. 25-1029 (U.S. Feb. 27, 2026) .......... 34

U.S. Dep't of Justice, Federal Firearm Rights Restoration, https://www.justice.gov/ffrr .......... 34

## INTRODUCTION

Peter Cordova was twenty years old when, in November 2010, he used a vehicle to flee from a peace officer in Midland County, Texas. That is all the record says about what he did. The offense was then a state jail felony, the lowest felony grade Texas has. A Texas court deferred adjudication, found him guilty in 2014, suspended his sentence, and ordered him to serve "ZERO DAYS" in jail. He also has a 2014 conviction for possessing marijuana. He finished probation in May 2017 and graduated from Texas Tech University two years later.

In January 2024, more than six and a half years after his probation ended, Odessa police stopped the truck he was driving and found a pistol under the seat. For possessing it, the United States sent him to federal prison for 34 months. Its theory is that the 2014 convictions stripped him of the right to keep and bear arms for the rest of his life.

The Government has never shown that this result is consistent with the Nation's historical tradition of firearm regulation. The district court denied Mr. Cordova's motion to dismiss the day it was filed, without a response from the Government. The panel affirmed on the strength of an offense label. Its per curiam opinion reasoned that "people pose . . . a threat" to others "when they evade

arrest in a motor vehicle," and that Mr. Cordova's "decision to use a car to evade the police is probative of his dangerousness." Panel Op. 2. No one has identified a single fact about how Mr. Cordova fled, how fast, how far, or whether anyone was ever in harm's way. The record contains none.

Four weeks after the panel ruled, the Supreme Court decided *United States v. Hemani*, 608 U.S. 772 (2026). *Hemani* held that 18 U.S.C. § 922(g)(3) could not constitutionally be applied to a man who used marijuana "about every other day." *Id.* at 778–79, 795. The Court measured the modern law against its historical analogues "in purpose and operation." *Id.* at 780. It refused to let the Government "designate any group as dangerous and thereby disqualify its members from having a gun" on "little more than its current say-so." *Id.* at 793 (quotation omitted). And it reserved the question whether § 922(g)(1) is constitutional, distinguishing provisions of § 922 that "involve some manner of pre-deprivation process." *Id.* at 791 n.6, 794.

A week later, in *Wolford v. Lopez*, 609 U.S. 185 (2026), the Court confirmed that a law within the Second Amendment's text is "presumptively unconstitutional," *id.* at 196, and that a historical analogue must be "close enough" to the modern law in how and why it burdened the right, *id.* at 197.

The Government cannot make that showing here. The only process Mr. Cordova received before he was disarmed was the adjudication of his two convictions. They established that he intentionally used a vehicle to flee from an officer and that he possessed marijuana. They did not establish that he threatened, hurt, or endangered anyone, let alone with a firearm. Neither offense resembles anything for which the Founding generation disarmed anyone, much less for life. The en banc Court should say so, reverse, and direct that the indictment be dismissed.

## JURISDICTIONAL STATEMENT

This is a direct appeal from a final judgment of conviction and sentence in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. It pronounced sentence on July 11, 2024, and entered its written judgment on July 17, 2024. ROA.6–7, 186. Mr. Cordova filed his notice of appeal on July 15, 2024. ROA.182–83. A notice filed after the announcement of sentence but before entry of judgment is treated as filed on the date of entry, Fed. R. App. P. 4(b)(2), so the appeal is timely. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Peter Cordova's only felony convictions are a 2014 Texas state-jail-felony conviction for evading arrest or detention with a vehicle, based on conduct in 2010, and a 2014 conviction for possessing marijuana. The Texas court suspended his sentence, and he completed probation in 2017. On his motion to dismiss, the Government offered no evidence and no historical analogue, and the record does not show how the flight occurred.

18 U.S.C. § 922(g)(1), which bars him from possessing a firearm for life on the basis of those convictions, violates the Second Amendment as applied to him.

## STATEMENT OF THE CASE

### A. Mr. Cordova's prior convictions

Mr. Cordova has two felony convictions. Both come from Midland County, Texas, and both date from May 2014. ROA.276–77.

*Evading arrest or detention with a vehicle.* On November 29, 2010, when he was twenty, Mr. Cordova used a vehicle to evade a known peace officer who was trying to arrest and detain him. ROA.276. That is all the record says about the conduct.

At the time, a first offense of evading with a vehicle was a state jail felony, Texas's lowest felony grade, punishable by 180 days to two years in a state jail. Act of June 19, 2009, 81st Leg., R.S., ch. 1400, § 4, 2009 Tex. Gen. Laws 4385, 4386 (former Tex. Penal Code § 38.04(b)(1)(B)); Tex. Penal Code § 12.35(a). On March 17, 2011, Mr. Cordova pleaded guilty. The state district court deferred adjudication and placed him on community supervision for five years. ROA.276.

On May 8, 2014, the court adjudicated him guilty. Its judgment identifies the offense as "EVADING IN A MOTOR VEHICLE," a "STATE JAIL FELONY OFFENSE" under "§38.04(b)(1)." Judgment Revoking Community Supervision and Adjudicating Guilt at 1, *State v. Cordova*, No. CR38141 (142nd Dist. Ct.,

Midland County, Tex. May 8, 2014) ("CR38141 Judgment"). The judgment is Exhibit 1 to Mr. Cordova's Motion for Judicial Notice, filed with this brief. Under "Findings on use of deadly weapon," the judgment states: "NO AFFIRMATIVE FINDING." *Id.* The court assessed two years in state jail, suspended the sentence, and placed Mr. Cordova on community supervision for three years. *Id.* at 1, 3. One condition was that he "[s]erve ZERO DAYS in the Midland County Jail." *Id.* at 5.

The Government has acknowledged that it "qualifies as a state jail felony subject to a statutory maximum penalty of two years' imprisonment." Gov't Panel Br. 30.

*Possession of marijuana.* On May 16, 2013, while on deferred adjudication, Mr. Cordova possessed marijuana in a drug-free zone. ROA.277. The amount was more than four ounces but not more than five pounds. ROA.251; Gov't Panel Br. 28. He pleaded guilty on May 8, 2014, and received three years' probation. ROA.277.

*Discharge.* Mr. Cordova never served a sentence of confinement on either conviction. ROA.276–77; CR38141 Judgment at 1, 5. While under supervision he enrolled at Texas Tech University. ROA.280. He was discharged from probation in both cases in May 2017. ROA.276–77. He earned a Bachelor of Science in

geosciences in 2019. ROA.280. The presentence report lists no conviction between 2014 and this case. ROA.276–78.

### B. The charged conduct and the motion to dismiss

On January 18, 2024, Odessa police detectives watching a house they associated with drug sales saw a truck driven by Mr. Cordova arrive; a passenger went inside briefly and returned. ROA.273. They stopped the truck for a traffic violation. Mr. Cordova had one passenger beside him and another in the back seat. ROA.273.

After officers said they would use a drug dog, Mr. Cordova told them there was a firearm in the truck and where it was. ROA.274. Under the driver's seat officers found a loaded Stoeger 9mm pistol with no round in the chamber, and in the back-seat area a digital scale and an unused syringe. ROA.274. Mr. Cordova said that he and his passengers had gone to the house to buy drugs but had not bought any, and that he had been using drugs for eight months. ROA.274. The presentence report does not say that officers found any controlled substance in the truck or on its occupants. *See* ROA.273–74.

A grand jury charged Mr. Cordova with one count of possessing a firearm after a felony conviction. ROA.24–25; 18 U.S.C. §§ 922(g)(1), 924(a)(8).

On April 16, 2024, Mr. Cordova moved to dismiss the indictment on the ground that § 922(g)(1) violates the Second Amendment as applied to him. ROA.37–46. He argued that his predicates were nonviolent and that neither Founding-era law nor Texas law imposed a lifetime ban. ROA.44–45.

The district court denied the motion the same day. ROA.93–94. Noting that the motion was filed prior to the scheduled rearraignment, used "a case over a year old," and raised an argument its own decisions had rejected, the court ruled without a response from the Government, which it "believe[d]" was "not necessary." ROA.93 n.2. The docket reflects no hearing on the motion, ROA.4–5, and the order found no facts about either conviction. The court relied on two of its decisions from 2022 and observed that "some might consider it a bit disingenuous to argue that" evading with a vehicle, which it called "a third-degree felony in Texas, is a 'non-violent' crime." ROA.93–94. The Government thus offered no evidence and identified no historical analogue before the district court ruled.

Two days later Mr. Cordova pleaded guilty without a plea agreement. ROA.273. While on pretrial release he was found with synthetic marijuana, and he was ordered detained. ROA.273. The presentence report was prepared on May 29, 2024. ROA.271. Over objection, the district court applied a four-level enhancement for possessing the firearm in connection with another felony offense, based on his

statement about going to the house and on the scale and syringe. ROA.229–30; ROA.275. It sentenced him to 34 months' imprisonment and three years' supervised release. ROA.186.

### C. The panel decision

A panel affirmed. *United States v. Cordova*, 176 F.4th 381 (5th Cir. 2026) (per curiam), *reh'g en banc granted, opinion vacated* (5th Cir. Sept. 14, 2026) ("Panel Op.").

The per curiam opinion stated that "we have held that people pose just such a threat when they evade arrest in a motor vehicle," Panel Op. 2 (citing *United States v. Simpson*, 152 F.4th 611, 614 (5th Cir. 2025), *cert. denied*, 146 S. Ct. 1830 (2026)), and that, "[g]iven that 'vehicular pursuits' are 'often catastrophic,' Cordova's decision to use a car to evade the police is probative of his dangerousness," *id.* (citing *Lange v. California*, 594 U.S. 295, 324 (2021) (Roberts, C.J., concurring in the judgment)). It concluded that his "decisions . . . demonstrate that he poses a credible threat to the physical safety of others." *Id.* The opinion cited no Founding-era law concerning flight and stated no fact about how Mr. Cordova fled.

Two members of the panel, Judges Ho and Oldham, concurred only in the judgment. Judge Ho observed that § 922(g)(1) "imposes a lifetime ban on the

possession of a firearm," Panel Op. 3, and that Mr. Cordova "was not sentenced to serve a single day in prison" and completed probation "seven years before he was found in possession of a firearm," *id.* at 4. But he concluded that "this case does not present a challenge to lifetime disarmament." *Id.* at 5.

Judge Oldham would replace *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025), and its progeny with an inquiry into dangerousness, under which "certain dangerous convicted criminals can be disarmed, so long as they have a chance to rebut the charge." Panel Op. 6, 29. He recognized that the evading conviction "is the lowest-level felony recognized in state law" and that "neither crime is inherently violent." *Id.* at 31. But relying on *United States v. Harrimon*, 568 F.3d 531 (5th Cir. 2009), he concluded that vehicular flight is "purposeful, violent, and aggressive" and that Mr. Cordova "is dangerous." Panel Op. 32–33.

### D. Rehearing en banc

Mr. Cordova petitioned for rehearing en banc. The Government agreed that rehearing was warranted and asked the full Court to go further than the panel had: to hold that § 922(g)(1) "is constitutional as a general matter and that any relief for non-dangerous felons should be addressed through the statutory procedure administered by the Attorney General under 18 U.S.C. § 925(c)." Gov't Reh'g

Resp. 2. Alternatively, it asked the Court to require a defendant to "show based on all relevant circumstances that he would not be dangerous if armed." *Id.* at 10. The response, filed after *Hemani*, does not cite it.

On September 14, 2026, the Court granted rehearing en banc and vacated the panel opinion.

## SUMMARY OF THE ARGUMENT

**I.** Mr. Cordova is one of "the people," and his possession of a handgun is presumptively protected. The Government therefore bears the burden of showing that disarming him is consistent with the Nation's historical tradition. *Hemani* and *Wolford* define that showing. The Government must identify well-accepted historical laws relevantly similar to the modern one "in purpose and operation." It must make the showing itself, on the record. And it may not substitute a label for the showing by designating a group as dangerous on its "say-so." *Hemani* leaves § 922(g)(1) open and distinguishes it from § 922(g)(3) on one ground: a conviction involves pre-deprivation process.

**II.** The Court should reject the Government's request to hold § 922(g)(1) valid in every application. The class of all persons convicted of an offense punishable by more than a year is not one that history recognizes. The class disarmaments of the Founding era reached people regarded as enemies of the government and ended when the person took an oath. Capital punishment and forfeiture were sentences for particular crimes, not automatic lifetime disabilities for every felony. And § 925(c) does not fill the gap. It was inoperative when Mr. Cordova was prosecuted, it is a matter of executive discretion, and it places the burden on the citizen.

**III.** The as-applied inquiry asks what the predicate conviction establishes. The statute makes the conviction the trigger, and *Hemani* makes the conviction's process the reason § 922(g)(1) differs from § 922(g)(3). The en banc Third Circuit has now held the same. A rule that looks beyond the conviction, to presentence reports and the circumstances of the charged possession, gives no notice, justifies disarmament after the fact, and cannot be administered on a motion to dismiss. The burden stays with the Government. If the Court instead adopts an individualized dangerousness inquiry, history requires a judicial finding on evidence, an opportunity to contest it, and an end to disarmament when the danger ends.

**IV.** Mr. Cordova's convictions do not carry the Government's burden. Under this Court's decision in *Hembree*, possession of marijuana cannot support disarmament. The evading conviction establishes only that he intentionally used a vehicle to flee from an officer. The offense has no element of speed, danger, or harm. It can be committed while obeying every traffic law. Texas marked dangerous flight with higher grades and with deadly-weapon findings, and his judgment records "NO AFFIRMATIVE FINDING." This Court said in *Diaz* that a defendant's convictions, which included evading under the same statute, "do not inherently involve a threat of violence."

A rule that vehicular flight always shows dangerousness borrows the "ordinary case" method of the Armed Career Criminal Act's residual clause, which the Supreme Court held unconstitutionally vague in *Johnson*, using vehicular flight as an example. The closest Founding-era analogue, flight without force, was punished by fine or imprisonment, not disarmament. And the Government's reliance on drug use and the circumstances of the stop fails because none of it was adjudicated before Mr. Cordova was disarmed, and *Hemani* rejects disarmament based on drug use "without any further showing."

**V.** Even if some disarmament were justified, lifetime disarmament is not. The historical practices the Government invokes were temporary or took only property, not the right to acquire other arms. Mr. Cordova completed his sentence in 2017. The argument is preserved, and the Government has itself put duration before the en banc Court.

**VI.** The Court should reverse and direct dismissal of the indictment. At a minimum it should vacate and remand for the district court to apply the correct standard, with the burden on the Government.

## STANDARD OF REVIEW

This Court reviews preserved challenges to the constitutionality of a criminal statute de novo. *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014). Mr. Cordova preserved his as-applied challenge by raising it in his motion to dismiss the indictment, ROA.37–46, which the district court denied on the merits, ROA.93–94. He pleaded guilty without a plea agreement and did not waive his right to appeal. ROA.273. His plea does not bar a challenge to the constitutionality of the statute of conviction. *Class v. United States*, 583 U.S. 174, 178–82 (2018).

## ARGUMENT

### I. The Second Amendment presumptively protects Mr. Cordova, and the Government bears the burden of justifying his disarmament.

#### A. Mr. Cordova is among "the people."

The Second Amendment secures "the right of the people to keep and bear Arms." U.S. Const. amend. II. "[T]he people" "unambiguously refers to all members of the political community, not an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008). The right belongs to "all Americans." *United States v. Hemani*, 608 U.S. 772, 779 (2026) (quoting *Heller*, 554 U.S. at 581). And the Supreme Court has rejected the argument that it belongs only to those the Government considers "responsible." *United States v. Rahimi*, 602 U.S. 680, 701–02 (2024).

This Court has held that a person with a felony conviction remains one of "the people" and that § 922(g)(1) regulates conduct the Amendment's text covers. *Diaz*, 116 F.4th at 466–67. The Government has preserved a contrary argument. Gov't Panel Br. 10. The Supreme Court's decision in *Wolford v. Lopez*, 609 U.S. 185 (2026), answers it. As to the person, *Bruen*'s first step asks whether the law applies "to 'the people'—which is to say, to 'all members of the political community.'" *Id.* at 195 (citations omitted). Historical materials offered to narrow the right "are out of place at *Bruen*'s first step," where "the question is simply

whether a challenged law falls within the Second Amendment's 'plain text.'" *Id.* at 205 (citation omitted). The Department of Justice now reads *Bruen*'s first step the same way: "*Bruen*'s framework does not permit 'smuggl[ing] additional limits, drawn from our regulatory tradition, into the plain-text stage of the inquiry,' of who constitutes one of 'the people.'" Application of 18 U.S.C. § 922(b)(1) and (c)(1) to Young Adults, 50 Op. O.L.C. ___, slip op. at 5 (Sept. 17, 2026) ("OLC Op.") (quoting *Wolford*, 609 U.S. at 214 n.1 (Barrett, J., concurring)). *See also Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J., dissenting).

B. The Government must show that disarming Mr. Cordova fits the Nation's historical tradition in both purpose and operation.

When the Amendment's text covers a person's conduct, "the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). Put another way, a law that reaches such conduct is "presumptively unconstitutional." *Wolford*, 609 U.S. at 196. "To overcome that presumption, the government then bears the burden of showing its regulatory efforts are 'consistent with the Nation's historical tradition of firearm regulation.'" *Hemani*, 608 U.S. at 780 (citation omitted). That burden is "heavy." *United States v. Mitchell*, 160

F.4th 169, 177 (5th Cir. 2025); *United States v. Kimble*, 142 F.4th 308, 312 (5th Cir. 2025).

Three features of the burden control this case.

*First*, the comparison is one of "why" and "how." A court "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit," and "[w]hy and how the regulation burdens the right are central to this inquiry." *Rahimi*, 602 U.S. at 692. *Hemani* sharpens the point: "The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld. Conversely, the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review." 608 U.S. at 780–81. The two laws must be "close enough" that a court can "infer that the restriction imposed by the modern law is likewise consistent with that right." *Wolford*, 609 U.S. at 197. And the analogue itself must have been widely adopted and well accepted: "[a]n outlier legal rule adopted in a few locales is not enough." *Id.* at 196, 207.

*Second*, the Government must make its showing itself, on the record. The Supreme Court "decide[s] cases 'based on the historical record' and arguments 'compiled by the parties.'" *Hemani*, 608 U.S. at 783 (citation omitted).

*Third*, a label is not a showing. The Government asked the *Hemani* Court "to conclude that anyone who regularly uses marijuana is categorically violent and dangerous without any further showing." *Id.* at 793. The Court refused. The Government offered "little more than its current say-so," and "affording the government that kind of 'broad power to designate any group as dangerous and thereby disqualify its members from having a gun' would risk allowing it to 'quickly swallow' the Second Amendment." *Id.* at 793–94 (quoting *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting)).

C. *Hemani* reserved § 922(g)(1), and its reasoning supports Mr. Cordova.

*Hemani* did not decide whether § 922(g)(1) is constitutional in any of its applications. "We do not address 18 U.S.C. § 922(g)(1)'s provision disarming individuals convicted of felonies (often including drug-related ones). . . . None of those issues is before us and we do not pass on them either way." 608 U.S. at 794.

In a footnote, the Court observed that provisions like § 922(g)(1) "involve some manner of pre-deprivation process before an individual's Second Amendment rights are lost." *Id.* at 791 n.6. "For that reason, they differ from subsection (g)(3) and 'nothing in our opinion should be taken to cast doubt' on them." *Id.* (quoting *Heller*, 554 U.S. at 626). The Court added that its holding should not be read to suggest "that the Second Amendment prohibits the

enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* (quoting *Rahimi*, 602 U.S. at 698).

Read with the rest of the opinion, the footnote supports Mr. Cordova in two ways.

First, it identifies process, meaning adjudication, as what separates a felony conviction from the Government's bare say-so. If process is what matters, the constitutional inquiry should be tied to what the adjudication actually established. *See* Part III, *infra*. Timing matters too: the process the Court described is "*pre*-deprivation." 608 U.S. at 791 n.6 (emphasis added). The Government cannot justify disarming a person by pointing to conduct that no court had adjudicated before he was disarmed.

Second, the footnote leaves the Government's burden in place. The Second Amendment may permit a legislature to regulate by category in some circumstances. But the category must be one that history supports, and the Government must prove that it is. The footnote's last sentence says so: "The problem in this case is simply that the historical evidence the government presents does not support the categorical restriction it urges." 608 U.S. at 791 n.6.

The same problem exists here. The Government has presented no historical evidence that the Founding generation disarmed people who fled from the authorities or who possessed an intoxicant, let alone for life.

## II. The Court should reject the Government's categorical rule.

The Government's lead position on rehearing is that § 922(g)(1) is constitutional in every application, so that "as-applied challenges to § 922(g)(1) are not necessary." Gov't Reh'g Resp. 10. It rests that position on three historical claims and on 18 U.S.C. § 925(c). Gov't Reh'g Resp. 11–17. None has merit.

### A. The Government may not disarm a class by calling it dangerous.

The Government first argues that because legislatures once disarmed groups they considered dangerous, Congress may "make the categorical judgment that all felons 'present a special danger of misuse' of firearms, . . . even those convicted of nonviolent offenses." Gov't Reh'g Resp. 12. *Hemani* rejected that form of argument when the Government made it for § 922(g)(3).

In *Hemani* the Government claimed that § 922(g)(3) "disarms individuals who are, as a 'category,' 'violen[t]' and 'unusually dangerous.'" 608 U.S. at 791 (citations omitted). The Court did not defer. It tested the claimed category against the historical laws and found that they "targeted different kinds of people, did so for different purposes, and operated in different ways." *Id.* at 783. It faulted the

statute because it "sweeps in large numbers of people without regard to whether" they shared the characteristic that had justified the historical restrictions. *Id.* at 786. And it refused to accept the Government's designation on "its current say-so." *Id.* at 793.

Section 922(g)(1) departs from the historical tradition in each of those ways. The Department of Justice frames the comparison in the same terms: relevant similarity "depends on the 'who,' the 'how,' and the 'why' of the historical regulation." OLC Op. 29.

*Who.* Section 922(g)(1) reaches anyone convicted of "a crime punishable by imprisonment for a term exceeding one year." With narrow exceptions for certain business offenses and state misdemeanors, 18 U.S.C. § 921(a)(20), it does not ask what the crime was, whether it involved violence, how long ago it occurred, or what sentence was imposed. Its reach is set by the grading choices of Congress and fifty state legislatures, made for reasons that have nothing to do with firearms. "Almost twenty million Americans have felony convictions." *United States v. Cockerham*, 162 F.4th 500, 517 (5th Cir. 2025) (Higginson, J., dissenting). The felony label now "reaches conduct ranging from reading someone else's email to 'opening a bottle of ketchup at the supermarket and putting it back on the shelf.'" *United States v.*

*Luna*, No. 25-40272, 2026 WL 2507689 at *2 (5th Cir. Aug. 25, 2026) (Willett, J., concurring) (footnotes omitted).

The historical classes the Government invokes were of a different kind. Loyalists and others who "refused to swear allegiance to the new Republic," Gov't Reh'g Resp. 12, were disarmed in wartime because they were thought ready to take up arms against the government. *See Range v. Att'y Gen.*, 124 F.4th 218, 229–30 (3d Cir. 2024) (en banc). Laws that disarmed disfavored groups are doubtful evidence of the right's scope in any event. *Cf. Wolford*, 609 U.S. at 212 (the claim that a Black Code provision, a "tainted artifact," "illuminates the original understanding of the right to keep and bear arms cannot be taken seriously"). Nor can the Government rely on laws disarming "tramps." It dates those laws to "the mid-1800s," Gov't Reh'g Resp. 12 (quotation omitted), but the vagrancy statutes it cited to the panel were enacted between 1878 and 1890, Gov't Panel Br. 26 n.14. Evidence that late carries little weight when it departs from Founding-era practice. *See Bruen*, 597 U.S. at 66; *see also Wolford*, 609 U.S. at 211.

*Why.* The Founding-era class disarmaments addressed a specific danger: armed resistance by people regarded as enemies of the government. This Court has said so: the Founders "did not disarm English Loyalists because they were believed to lack self-control; it was because they were viewed as political threats to our

nascent nation's integrity." *United States v. Connelly*, 117 F.4th 269, 278 (5th Cir. 2024). Section 922(g)(1) rests on no comparable judgment about the people it covers. The Government's substitute is a modern recidivism study. Gov't Reh'g Resp. 12–13. But under *Bruen* "the government may not simply posit that the regulation promotes an important interest." 597 U.S. at 17. The question is historical tradition, not a legislature's prediction about risk.

The study also undercuts the Government's position. On its figures, about two of every three people released from prison for a fraud or drug offense were *not* arrested for a violent crime in the following decade. *See* Gov't Reh'g Resp. 12–13. And the study measures people who were sent to prison. Mr. Cordova was not.

*How.* The historical class-based laws were conditional and temporary. A person disarmed for refusing an oath could take the oath and recover his arms. Judge Oldham's survey shows that "those who were considered dangerous could take loyalty oaths and restore their rights." Panel Op. 25; *see also United States v. Williams*, 113 F.4th 637, 650–57 (6th Cir. 2024). Section 922(g)(1) has no oath and no term. It lifts only if the convicting jurisdiction or the Attorney General chooses to lift it. 18 U.S.C. §§ 921(a)(20), 925(c).

This Court's cases already recognize that a legislature's label is not enough. "Simply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny," because felony status is a "shifting benchmark" that "should not define the limits of the Second Amendment." *Diaz*, 116 F.4th at 469. Even in upholding the disarmament of drug traffickers as a class, this Court insisted that, "[a]lthough Congress can label certain classes of people—such as felons—dangerous, courts cannot grant those determinations blanket deference." *Kimble*, 142 F.4th at 315, 318. Then-Judge Barrett reached the same conclusion: legislatures may disarm the dangerous, but "that power extends only to people who are *dangerous*." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).

Nor do the Supreme Court's statements about felon-dispossession laws relieve the Government of its burden. *Heller* said that it did not "cast doubt on longstanding prohibitions on the possession of firearms by felons," which it called "presumptively lawful," without "undertak[ing] an exhaustive historical analysis." 554 U.S. at 626–27 & n.26. The Court has repeated the statement since, most recently in *Wolford*, 609 U.S. at 193. But it has never applied it to uphold § 922(g)(1), and in *Hemani* it did "not pass on" the statute "either way." 608 U.S. at 794. The Department of Justice, in an opinion that does not question § 922(g), now describes the same sentence of *Heller* as "dicta announced without citation or

supporting analysis" and observes that "[p]resumptions can be overcome." OLC Op. 26, 49 (addressing the sentence's reference to conditions on commercial sales).

Nor do the out-of-circuit decisions the Government cites supply the missing history. Gov't Reh'g Resp. 7–8. Several decisions rest principally on pre-*Bruen* circuit precedent. *See, e.g.*, *United States v. Hunt*, 123 F.4th 697, 706–08 (4th Cir. 2024); *Vincent v. Bondi*, 127 F.4th 1263, 1264–66 (10th Cir. 2025). Others rest on the premise that legislatures may disarm whole classes on the basis of status. *E.g.*, *United States v. Jackson*, 110 F.4th 1120, 1125–28 (8th Cir. 2024); *Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025). The en banc Third Circuit has now rejected that premise. Upholding § 922(g)(1) only "insofar as it disarms convicts who pose a risk of physical violence from misusing guns," it held that "[n]ot every crime proves a risk of physical violence." *United States v. Bost*, No. 24-1719, slip op. at 5, 12 (3d Cir. Oct. 13, 2026) (en banc).

The Government relies on the Ninth Circuit's en banc decision in *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025) (en banc). Gov't Reh'g Resp. 7, 12–13, 16. *Duarte* held § 922(g)(1) "constitutional as applied to Duarte and other non-violent felons" on two historical grounds: the capital-punishment theory addressed in Part II.B, *infra*, and a "historical tradition of categorically disarming those whom the legislature determines to represent a 'special danger of misuse.'" 137 F.4th at

761–62 (citation omitted).[1] Although it called Congress's judgment about felons "fully supported" by the first ground, it did "not hold . . . that every legislative judgment that a group of individuals presents a 'special danger of misuse' must be rooted in history." *Id.* at 761 n.19. That reservation would leave legislatures the "broad power to designate any group as dangerous" that *Hemani* refused to recognize. 608 U.S. at 793.

The decisions the Government cites all predate *Hemani* and *Wolford*. None holds the Government to the showing those cases require: analogues that were widely adopted and well accepted, and that are "close enough" to the modern law in how and why they burdened the right. *Wolford*, 609 U.S. at 196–97. The First Circuit has since upheld § 922(g)(1) for a drug-possession conviction, reading *Hemani*'s footnote 6 as "clarifying that the relevant inquiry centers on whether the individual poses 'a special danger of misuse,' not necessarily a danger of physical violence." *United States v. Levasseur*, No. 24-1687, 2026 WL 2731003, at *8 (1st Cir. Sept. 16, 2026). But that footnote quotes a reservation from *Rahimi*, and it adopts no test. *See* 608 U.S. at 791 n.6.

[1] Mr. Cordova's petition, at 16–17, did not describe *Duarte* accurately.

B. Founding-era capital punishment does not establish a tradition of lifetime disarmament for every felony.

The Government's second argument is that because "historical legislatures authorized severe punishment such as the death penalty and estate forfeiture for many felonies," the "lesser restriction of permanent disarmament" is permissible for all felonies, "regardless of whether a modern defendant's specific offense would have been capital 'at the Founding.'" Gov't Reh'g Resp. 13–14 (quoting *Diaz*, 116 F.4th at 469). That argument is deeply flawed, and the Court should reject it.

*First*, the historic execution of some individuals with felony convictions does not meet the requirement that historical analogues burden the right in similar ways and for similar reasons. *Bruen*, 597 U.S. at 29. In *Wolford*, the Supreme Court explained that "the 'how' and 'why' of the historical analogue and modern regulation must be close enough to enable a court to say: 'Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right.'" 609 U.S. at 197. So the question here is whether, because capital punishment was understood to be consistent with the Second Amendment, a court can infer that barring felons who have completed their sentences from possessing firearms is likewise consistent with it. As in *Wolford*,

"[t]he question answers itself." *Id.* at 210. The gap between capital punishment and § 922(g)(1) "is just too wide." *Id.*

Capital punishment and forfeiture of estate do not resemble § 922(g)(1) "in purpose and operation." *Hemani*, 608 U.S. at 780. Felonies in England were once "a short, specified list of offenses," *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting), but today "[m]any crimes classified as misdemeanors, or nonexistent, at common law are now felonies," *Tennessee v. Garner*, 471 U.S. 1, 14 (1985). And capital punishment was just that: a punishment, imposed by a court as the sentence for a particular crime. Section 922(g)(1) is not part of any sentence. It is a disability that attaches automatically, by operation of federal law, to state and federal convictions of every kind. It has no term. And it is enforced by a new prosecution carrying up to fifteen years in prison. 18 U.S.C. § 924(a)(8). A practice that diverges so sharply in how and why it burdens the right does not carry the Government's burden. *Hemani*, 608 U.S. at 783.

As then-Judge Barrett put it, "[t]he obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). The en banc Third Circuit agrees that capital punishment for some crimes "does not suggest that the

particular (and distinct) punishment at issue here—de facto lifetime disarmament for all felonies and felony-equivalent misdemeanors—is rooted in our Nation's history and tradition." *Range*, 124 F.4th at 231. The same court said on October 13, 2026, that the Government's "apparent attempt to broaden discrete crimes justly punished by death to include all felonies, much less all crimes punishable by more than one-year imprisonment, misses the point." *Williams v. Att'y Gen.*, No. 24-1091, slip op. at 11 (3d Cir. Oct. 13, 2026) (en banc). Even the Second Circuit, which upholds § 922(g)(1) across the board, was "reluctant to place much weight on this argument." *Zherka*, 140 F.4th at 82.

*Second*, the argument proves too much. If eligibility for execution in 1791 licenses any lesser deprivation today, a legislature could strip people with felony convictions of the freedom of speech or the protection of the Fourth Amendment for life. *See* Panel Op. 10 (Oldham, J., concurring in the judgment). No other right works that way. *See Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting).

*Third*, the Founding generation was moving away from the perpetual consequences on which the theory depends. "[A]s the number of designated felonies continued to grow, so did the variations on punishment, especially in the American colonies." *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). In short, "the consequences of a felony conviction were not as categorically severe" as the

Government supposes. *Id.* at 461. The statute the Government cites for capital forgery goes on to provide that "no conviction or judgment for any of the offences aforesaid, shall work corruption of blood, or any forfeiture of estate." Act of Apr. 30, 1790, ch. 9, §§ 14, 24, 1 Stat. 112, 115, 117; *see* Gov't Reh'g Resp. 14. And a felon who completed his sentence could acquire arms again. *Range*, 124 F.4th at 231.

These defects go to the capital-punishment rationale itself. But even if the Court retains it for crimes that were capital at the Founding, as *Diaz* did, it cannot be extended to every felony. And on *Diaz*'s own terms Mr. Cordova prevails, because flight without force was not a felony at the Founding and no capital analogue fits marijuana possession. *See* Parts IV.A and IV.B.5, *infra*.

### C. The Government's remaining sources do not show a tradition of disarming all felons.

The Government cites three more sources. Gov't Reh'g Resp. 15–16. None is a historical regulation comparable to § 922(g)(1).

The first is the proposal of the Anti-Federalist minority at Pennsylvania's ratifying convention, which would have barred disarming the people "unless for crimes committed, or real danger of public injury from individuals." *Id.* at 15 (emphasis omitted). The proposal was defeated, and "relying solely on these types

of unadopted proposals to establish a tradition is a 'dubious' practice." *Diaz*, 116 F.4th at 470.

The second is a pair of model penal codes that Edward Livingston drafted in the 1820s, a generation after the Founding. Gov't Reh'g Resp. 15. As the Government describes them, they listed the "suspension" and permanent "forfeiture" of certain rights "among the punishments courts could impose." *Id.* That is a sentence pronounced by a judge for a particular offense, not an automatic lifetime disability for every felony.

The third is a set of laws requiring "forfeiture of firearms by persons who committed non-violent hunting offenses." *Id.* (quoting *Jackson*, 110 F.4th at 1127). Forfeiture of a weapon used in an offense did not, without more, bar the offender from keeping or acquiring other arms. *See Range*, 124 F.4th at 231; Part V.B, *infra*.

D. Section 925(c) does not cure the problem.

Finally, the Government argues that "[a]ny constitutional concerns on the margins are remediated by § 925(c)." Gov't Reh'g Resp. 16. Section 925(c) does not do that work, for three reasons.

**1. The remedy did not exist when Mr. Cordova was prosecuted.** Since 1992, appropriations riders have barred ATF from acting on § 925(c) applications.

*United States v. Bean*, 537 U.S. 71, 74–75 (2002). The provision was "rendered inoperative." *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007). The Solicitor General has told the Supreme Court, in a case from this Circuit, that the "process was inoperative at the time of respondent's offense conduct." Petition for a Writ of Certiorari at 5, *United States v. Cockerham*, No. 25-1029 (U.S. Feb. 27, 2026).

The rule reviving the program took effect on September 21, 2026, two years and eight months after Mr. Cordova's arrest, and the Department has said that it will not accept applications from the public until November 4, 2026. 91 Fed. Reg. 54,054 (Aug. 20, 2026) (codified at 28 C.F.R. pt. 107); U.S. Dep't of Justice, Federal Firearm Rights Restoration, https://www.justice.gov/ffrr (last visited Oct. 12, 2026).

The question in this criminal appeal is whether the Government could constitutionally punish Mr. Cordova for possessing a firearm on January 18, 2024. A remedy that did not then exist cannot answer it. The First Circuit declined to consider § 925(c) for this reason: the "program was defunct at the time of Levasseur's conviction." *Levasseur*, 2026 WL 2731003, at *9 n.15. The Sixth Circuit called the remedy "practically unavailable." *Williams*, 113 F.4th at 661. The en banc Third Circuit agrees. A defendant need not seek relief under § 925(c) before raising the Second Amendment as a defense; the process "has not yet

resumed," and the court knew of "no other context in which a criminal defendant must first seek administrative permission before raising a constitutional defense in his criminal prosecution." *Bost*, slip op. at 4. Seven judges of the same court also rejected the Government's claim that § 925(c) "turns a textually permanent ban into a temporary restraint": the Government "can offer no practice supporting that view," the program "is a slow trickle of relief available only upon invitation," and a court's "duty is to decide the case based on present facts, not future promises." *Williams v. Att'y Gen.*, slip op. at 20–21 (plurality opinion).

**2. Section 925(c) is discretionary, and it inverts the burden.** The statute provides that the Attorney General "may grant such relief if it is established to his satisfaction" that the applicant "will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). The implementing rule keeps that discretion. 28 C.F.R. § 107.20(a). The Department "rejects automatic restoration of rights for any particular group." 91 Fed. Reg. at 54,059. And judicial review is available only after an actual denial. *Bean*, 537 U.S. at 75–78.

That is the kind of open-ended discretion *Bruen* contrasted with "narrow, objective, and definite standards": a regime that turns on an official's "appraisal of facts, the exercise of judgment, and the formation of an opinion." 597 U.S. at 38–39

n.9 (citations omitted). It also reverses the constitutional burden. Under *Bruen* and *Hemani*, the Government must justify disarmament. Under § 925(c), the citizen must persuade the department that prosecutes him that he deserves his rights back.

### 3. The Supreme Court did not treat § 925(c) as an answer in *Hemani*.

The Government told the Court that "any constitutional concerns about the application of Section 922(g)(3) in marginal cases can be addressed by petitioning the Attorney General under 18 U.S.C. 925(c), subject to judicial review." Brief for the United States at 5, *United States v. Hemani*, No. 24-1234 (U.S. Dec. 12, 2025). The Court's opinion does not mention § 925(c). It held the prosecution unconstitutional, because "when the government crosses the line from permissible regulation into unconstitutional infringement, courts have a duty to say so in the cases before them." 608 U.S. at 779.

## III. The as-applied inquiry asks what the predicate conviction establishes, and the Government bears the burden.

The en banc Court should hold that the as-applied inquiry is anchored to the predicate conviction. Section 922(g)(1) disarms on the basis of a conviction, so the question is whether the Nation's tradition supports disarming a person on the basis of what his felony conviction establishes. The Government may show what the conviction establishes through its elements, as the judgment of conviction records

them. It may not rest on an offense label. And it may not rest on conduct that no court adjudicated before the person was disarmed.

The en banc Third Circuit has now anchored the inquiry to the predicate crime, leaving open whether facts beyond its elements may be considered. "[C]ourts must look only at the predicate crime that supports the § 922(g)(1) prosecution in the first place," and when that crime "does not show even a risk of physical violence in the first place, the government cannot go on a fishing expedition, requiring him to disprove his own risk of violence." *Bost*, slip op. at 12, 16. *Accord Williams v. Att'y Gen.*, slip op. at 14 & n.16 (looking to "the elements of the predicate offense," not to "an unbounded inquisition into the general dangerousness of an individual").

A. The statute and the Constitution both make the conviction the measure.

Section 922(g)(1) applies to a person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." The conviction is the only fact that triggers the disability. "§ 922(g)(1) turns on convictions, not allegations." *Cockerham*, 162 F.4th at 507. The "relevant consideration" is therefore the defendant's "'prior convictions that are punishable by imprisonment for a term exceeding one year,' not unproven conduct charged contemporaneously with a defendant's (g)(1) indictment or prior conduct that did

not result in a felony conviction." *Kimble*, 142 F.4th at 318 (quoting *Diaz*, 116 F.4th at 467). *Accord United States v. Hernandez*, 159 F.4th 425, 428 (5th Cir. 2025) (per curiam) ("we sift the elements of a defendant's prior convictions through *Bruen*'s analogical framework, and not the defendant himself"); *Mitchell*, 160 F.4th at 187; *United States v. Hembree*, 165 F.4th 909, 915–18 (5th Cir. 2026), *cert. denied*, No. 25-1219 (U.S. Oct. 5, 2026).

Because Congress made the conviction the trigger, an as-applied challenge asks whether the Second Amendment permits the Government to punish a person for possessing a firearm because of that conviction. A court may not sustain the statute on some other ground on which Congress might have disarmed him but did not. *See People v. Burns*, 2015 IL 117387, ¶ 30, 79 N.E.3d 159 ("It would be improper for this court to condition the constitutionality of [a firearm statute] on the State's proof of a defendant's felon status when the legislature did not make that requirement an element of the offense.").

*Hemani* proceeded the same way. The Government suspected Mr. Hemani of far more than marijuana use. But "[t]he charge had nothing to do with terrorism," "[n]or did the charge involve possession of cocaine, drug trafficking, or anything like that," and the Court decided the case on the one fact the Government had charged. 608 U.S. at 778–79.

The Constitution points the same way. *Hemani* distinguished § 922(g)(1) because it "involve[s] some manner of pre-deprivation process." *Id.* at 791 n.6. The historical laws the Government invoked there "usually provided some form of process before an individual lost any of his liberties, even temporarily." *Id.* at 790. *Rahimi* upheld § 922(g)(8) for the same reason: that statute "applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another." 602 U.S. at 699.

The only pre-deprivation process § 922(g)(1) affords is the prior criminal case, and that case adjudicated the elements of the predicate offense. The Government cannot justify the disarmament by pointing to things that case never decided, such as a paragraph in a later presentence report or the circumstances of the federal arrest. *Hemani* rejected a similar argument. It did not matter that an unlawful user would receive "a full-dress criminal trial" before he could be imprisoned or permanently disarmed, because § 922(g)(3) offered him "no pre-deprivation process." 608 U.S. at 791 (quotation omitted). The Government cannot claim the benefit of footnote 6 while discarding its premise.

Judge Willett reads this Court's precedents to allow one thing more: "Qualifying convictions define the universe; properly established facts about those convictions may inform whether disarmament is constitutionally justified." *Luna*,

2026 WL 2507689 at *9 (Willett, J., concurring). The Court need not decide whether that is right. The Government established no facts about Mr. Cordova's convictions beyond their elements.

### B. A whole-record inquiry gives no notice, justifies disarmament after the fact, and cannot be administered.

*Notice.* A person must be able to know, before he picks up a firearm, whether he is exercising a constitutional right or committing a felony punishable by fifteen years in prison. Under a conviction-based rule he knows what a court will examine: his own judgment of conviction. Under the Government's rule he does not. "There is no way for someone who seeks to exercise Second Amendment rights to know what past criminal history and life circumstance we, on appeal, will decide puts them in prison because we, on appeal, deem them irredeemably 'dangerous.'" *United States v. Debrow*, 183 F.4th 402, 406 (5th Cir. 2026) (opinion of Higginson, J.).

*Timing.* The Government relies on what officers found on January 18, 2024, to show that Mr. Cordova had no right to possess a firearm on January 18, 2024. Gov't Reh'g Resp. 18. But § 922(g)(1) had disarmed him since 2014. If that disability was unconstitutional when the stop began, nothing discovered during the stop could supply the missing justification. Process that arrives after the right is lost

comes too late. *See Hemani*, 608 U.S. at 791. Conduct that accompanies the possession cannot retroactively strip the right.

*Administrability.* An as-applied challenge is raised by a pretrial motion, which a court may decide when it presents a question that can be determined "without a trial on the merits." Fed. R. Crim. P. 12(b)(1); *see United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005). What a conviction establishes is that kind of question. Whether a person is "dangerous" in light of everything he has ever done is not. The Government's rule would turn every § 922(g)(1) case into a trial of the defendant's life, conducted on hearsay.

The Government answers that a conviction-based rule "often gives demonstrably dangerous offenders access to guns," citing cases in which the record described drug distribution, a threat, or a killing that was not the basis of the predicate conviction. Gov't Reh'g Resp. 6–7. The answer is to prosecute that conduct. Federal law punishes carrying a firearm during a crime of violence or drug-trafficking crime. 18 U.S.C. § 924(c)(1)(A). And a court may bar a person from possessing firearms as a condition of pretrial release, probation, or supervised release. 18 U.S.C. §§ 3142(c)(1)(B)(viii), 3563(b)(8), 3583(d). What the Government may not do is skip the prosecution and use an unproven allegation to imprison a person for possessing a firearm.

C. The burden stays with the Government.

The Government asks the Court to require the defendant "to demonstrate that he is not dangerous." Gov't Reh'g Resp. 18 (quoting *Williams*, 113 F.4th at 657). That gets *Bruen* backwards. 597 U.S. at 24. A law within the Amendment's text is "presumptively unconstitutional," *Wolford*, 609 U.S. at 196, and "the government then bears the burden," *Hemani*, 608 U.S. at 780. *Hemani* was decided on the ground that the Government had not "carried its conceded burden." *Id.* at 795. This Court has held the same since *Diaz*. 116 F.4th at 467. Judge Oldham agreed here. Panel Op. 29.

D. If the Court adopts a broader dangerousness inquiry, the inquiry must carry the safeguards that history required.

Several members of the Court have suggested that an as-applied challenge should turn on an individualized assessment of dangerousness. *See* Panel Op. 29–33 (Oldham, J., concurring in the judgment); *United States v. Mancilla*, 155 F.4th 449, 452 (5th Cir. 2025) (Elrod, C.J., concurring). The Sixth Circuit takes that approach. *Williams*, 113 F.4th at 657–63. A Third Circuit panel did, *Pitsilides v. Barr*, 128 F.4th 203, 212 (3d Cir. 2025), but the en banc court has since held that *Pitsilides* "is no longer our touchstone." *Bost*, slip op. at 5. Mr. Cordova does not urge that approach. If the Court adopts it, four conditions follow from the history on which it rests.

First, the Government bears the burden. *Bruen*, 597 U.S. at 24; Panel Op. 29 (Oldham, J., concurring in the judgment).

Second, dangerousness must be found by a court, on evidence, in a proceeding where the person can contest it. The historical laws "involved judicial determinations." *Rahimi*, 602 U.S. at 699. As Judge Oldham put it, those disarmed "had a chance to contest their dangerousness." Panel Op. 28.

Third, the finding must be made by the district court. An appellate court reviewing the denial of a motion to dismiss without factual findings is not the proper forum. *See, e.g.*, *Pitsilides*, 128 F.4th at 213 (remanding for factfinding).

Fourth, disarmament lasts only as long as the danger. "[I]f the justification for disarmament was dangerousness, then that burden could be lifted if an individual was no longer considered dangerous." *Mancilla*, 155 F.4th at 453 (Elrod, C.J., concurring); *see* Part V, *infra*.

Those conditions were not met here. On the motion to dismiss, the Government offered no evidence, the district court made no finding that Mr. Cordova is dangerous, and he had no opportunity to contest the point. The first such finding in this challenge came from the appellate panel, and it rested on an

offense label. Under any version of a dangerousness inquiry, the judgment cannot stand.

## IV. The Government has not shown that Mr. Cordova's convictions support disarming him.

The Government bore the burden of identifying historical laws that disarmed comparable people, for comparable reasons, in a comparable way. *Hemani*, 608 U.S. at 783; *Wolford*, 609 U.S. at 196–97; *accord Kimble*, 142 F.4th at 315 (Government must identify a "class of persons at the Founding who were 'dangerous' for reasons comparable to" the defendant (quoting *Connelly*, 117 F.4th at 278)). It offered nothing on the motion to dismiss. On appeal it has pointed to Mr. Cordova's two convictions, to his drug use, and to the circumstances of the stop. Gov't Panel Br. 28–32; Gov't Reh'g Resp. 18. None carries the burden.

### A. Possession of marijuana does not.

This Court has held that a conviction for simple possession of a controlled substance cannot support disarmament under § 922(g)(1). *Hembree*, 165 F.4th at 915–18; *Luna*, 2026 WL 2507689 at *2. As Judge Oldham recognized, Mr. Cordova's arguments on this point are "strong." Panel Op. 32. Before the panel, the Government compared marijuana possession to Founding-era crimes punished by death or forfeiture, Gov't Panel Br. 12–16; this Court has held those "very same analogues" insufficient for drug offenses, including simple possession, *Hembree*,

165 F.4th at 915–18; *see Kimble*, 142 F.4th at 313–14; and the rehearing response does not renew the comparison. And under *Hemani*, regular marijuana use does not justify disarmament "without any further showing." 608 U.S. at 795.

Nor do the two laws the Government cites that punished a second felony or a second burglary with death, Gov't Panel Br. 30, add anything to the capital-punishment argument answered in Part II.B, *supra*. Two statutes, one from New York and one from New Hampshire, are not a tradition. *See Wolford*, 609 U.S. at 207.

B. Evading arrest or detention with a vehicle does not.

**1. What the conviction establishes.** Under the statute in force in November 2010, a person committed the offense "if he intentionally flees from a person he knows is a peace officer attempting lawfully to arrest or detain him." Tex. Penal Code § 38.04(a) (2009). It was a state jail felony if "the actor uses a vehicle while the actor is in flight and the actor has not been previously convicted under this section." *Id.* § 38.04(b)(1)(B). The offense has no element of speed, recklessness, collision, injury, or danger to anyone.

Texas courts construe it accordingly. "The statute does not require high-speed fleeing, or even effectual fleeing. It requires only an attempt to get away from a known officer of the law. Thus, under the law, fleeing slowly is still fleeing."

*Mayfield v. State*, 219 S.W.3d 538, 540–41 (Tex. App.—Texarkana 2007, no pet.). Even the decision on which Judge Oldham relied acknowledged that it is "possible . . . to be guilty of fleeing by vehicle despite obeying all traffic laws and later surrendering quietly." *Harrimon*, 568 F.3d at 536.

Texas law also shows what a conviction for the base offense does *not* establish. When flight actually harmed someone, the statute graded the offense higher. It was a third-degree felony if "another suffers serious bodily injury as a direct result" of the pursuit, and a second-degree felony if "another suffers death." Tex. Penal Code § 38.04(b)(2)(B), (b)(3) (2009). When the manner of driving actually endangers others, Texas law provides for a deadly-weapon finding, which requires proof that "other people were put in actual danger." *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). The finding is entered in the judgment. Tex. Code Crim. Proc. art. 42A.054(c) (formerly art. 42.12, § 3g(a)(2)).

None of that happened here. Mr. Cordova was convicted of the base offense. His judgment recites: "Findings on use of deadly weapon: NO AFFIRMATIVE FINDING." CR38141 Judgment at 1. The court found that "the best interest of both the public and the defendant will be served" by suspending his sentence, and it ordered that he serve "ZERO DAYS" in jail. *Id.* at 3, 5. The federal record adds

only that he used a vehicle to evade an officer who was trying to arrest and detain him. ROA.276. The Government has never offered more.

**2. Evading arrest does not inherently involve a threat of violence.** The offense can be committed in many ways, many of them nonviolent. *See* Part IV.B.1, *supra*. This Court said as much in *Diaz*. The defendant's "only relevant criminal convictions" there were "car theft, evading arrest, and possessing a firearm as a felon," 116 F.4th at 467, and the evading conviction was under the same Texas statute, *id.* at 462. The Court acknowledged that "the justification behind going armed laws—to 'mitigate demonstrated threats of physical violence'—does not necessarily support a tradition of disarming Diaz, whose underlying convictions do not inherently involve a threat of violence." *Id.* at 470 n.5.

The per curiam opinion did not mention that footnote. Judge Oldham said the same of Mr. Cordova's convictions: "neither crime is inherently violent." Panel Op. 31. *See also Duarte*, 137 F.4th at 761–62 (accepting without discussion that a defendant with two convictions for evading a peace officer was a "non-violent" felon); *cf. Lange*, 594 U.S. at 307 ("Those suspected of minor offenses may flee for innocuous reasons and in non-threatening ways.").

**3. *Simpson* rested on its facts.** Even if conduct beyond the elements could be considered, the per curiam opinion's rule would not follow. Its only authority for the proposition that "people pose just such a threat when they evade arrest in a motor vehicle" was *Simpson*. Panel Op. 2. *Simpson* announced no such rule. It examined the "conduct underlying the predicate offense," 152 F.4th at 614 (quotation omitted), and the conduct was this: "In an attempt to avoid police, who were trying to make a traffic stop, Simpson 'accelerated' the car he was driving, 'lost control[,] and collided into a brick wall.' He was then already a convicted felon, and he had cocaine and a loaded revolver in his possession." *Id.* The Court added that, "in any event, Simpson had a loaded gun on him when he crashed the vehicle to evade arrest." *Id.* at 615.

*Simpson* also said that the Court had "previously treated evading arrest or detention with a vehicle as 'violent conduct' that can support a conviction under § 922(g)(1)." 152 F.4th at 614 (citing *United States v. Reyes*, 141 F.4th 682 (5th Cir. 2025) (per curiam)). *Reyes*, too, turned on its facts. There the vehicle "failed to yield, ran a stop sign, and continued to travel at a high rate of speed with its headlights off." 141 F.4th at 686 n.8. Neither decision held that a conviction under § 38.04, without more, proves a threat of violence. The per curiam opinion took that step, and it took it with no facts at all.

**4. A categorical rule about vehicular flight revives the "ordinary case" inquiry that *Johnson* held unconstitutionally vague.** Judge Oldham reached the panel's result by relying on *Harrimon*, which held that fleeing by vehicle is "purposeful, violent, and aggressive" and that, "in the ordinary case, fleeing by vehicle poses a serious risk of injury to others." Panel Op. 32; *Harrimon*, 568 F.3d at 534, 536. Those are terms of art from the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(ii), which asked not what the defendant did but what the "ordinary case" of the offense involves. *Harrimon*'s own figure was "roughly .04 injuries to others per pursuit." 568 F.3d at 537.

The Supreme Court reasoned the same way in *Sykes v. United States*, 564 U.S. 1 (2011), which held vehicular flight a violent felony. Four years later it overruled *Sykes* and held the residual clause void for vagueness. *Johnson v. United States*, 576 U.S. 591, 606 (2015). The clause "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* at 597. The statute in *Sykes* "covered everything from provoking a high-speed car chase to merely failing to stop immediately after seeing a police officer's signal. How does common sense help a federal court discern where the 'ordinary case' of vehicular flight in Indiana lies along this spectrum?" *Id.* at 599 (citation omitted).

A categorical rule asks the question *Johnson* held unanswerable: is the ordinary vehicular flight dangerous? And it uses the answer to extinguish a constitutional right, not merely to enhance a sentence. An inquiry too indeterminate to satisfy due process cannot carry the Government's burden under the Second Amendment. And whatever the "ordinary case" may be, the base offense was what Texas charged when no serious bodily injury or death was proved, and it has nothing to do with firearms. *See* Part IV.B.1, *supra*.

The en banc Third Circuit rejected the same reasoning for drunk driving, focusing "not on Williams's general dangerousness but on whether Williams would have been punished for his conduct because it was thought to correlate with future dangerous use of arms," and holding that the offense "plainly does not contain threatening or violent elements." *Williams v. Att'y Gen.*, slip op. at 14–15.

**5. History supplies no analogue.** Flight from the authorities is not a modern problem. When a challenged regulation addresses "a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. The Government has never identified a Founding-era law that disarmed a person for fleeing from an officer or for resisting one. The per curiam opinion cited none.

Under the en banc Third Circuit's framework, that omission would be fatal: a crime with "violent or threatening elements" speaks for itself, but whether other offenses "justify disarmament depends on their own historical analogies," and when the predicate "does not show even a risk of physical violence," the Government "must provide a different analogy." *Bost*, slip op. at 12, 13, 16.

The common law graded these offenses by force and custody. A person who opposed an arrest on criminal process, broke out of prison while held for felony, or forcibly rescued a person held for felony could be guilty of felony. 4 William Blackstone, Commentaries on the Laws of England 129–31 (1769). But a person already under arrest who slipped away "by eluding the vigilance of his keepers before he is put in hold" was "punishable by fine or imprisonment." *Id.* at 129–30. The Texas offense requires neither force nor custody. It is flight before arrest.

The First Congress drew similar lines. It punished with death the forcible rescue of a person convicted of a capital crime. Act of Apr. 30, 1790, ch. 9, § 23, 1 Stat. 112, 117. But a person who "knowingly and wilfully obstruct[ed], resist[ed] or oppose[d]" a federal officer serving process, or who "assault[ed], beat or wound[ed]" the officer, could be "imprisoned not exceeding twelve months, and fined not exceeding three hundred dollars." *Id.* § 22. An offense punishable by no more than twelve months is not a predicate under § 922(g)(1) at all.

Under *Diaz*'s own method, this history points away from disarmament. *Diaz* asked how the Founding generation punished the analogous crime. 116 F.4th at 468–69. For theft, the answer was death. For flight without force, it was a fine or imprisonment, and under federal law even forcible resistance drew no more than a year.

**6. The felony label is a shifting benchmark.** A Texas state jail felony carries 180 days to two years. Tex. Penal Code § 12.35(a). A court may punish it as a Class A misdemeanor, or authorize the State to prosecute it as one. *Id.* § 12.44. Federal law exempts from § 922(g)(1) "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). Had Texas called this two-year offense a misdemeanor, the conviction would not be a predicate at all.

Texas has in fact called it one. From 1995 to 2001, a first offense of evading with a vehicle was a Class A misdemeanor. Acts 1995, 74th Leg., R.S., ch. 708, § 1. In 2001 it became a state jail felony. Tex. S.B. 215, 77th Leg., R.S. (2001). In 2011 it became a third-degree felony. Act of June 17, 2011, 82nd Leg., R.S., ch. 920, § 3, 2011 Tex. Gen. Laws 2321, 2322. The conduct did not change. That is the "shifting benchmark" *Diaz* warned against. 116 F.4th at 469.

### C. Uncharged conduct and the circumstances of the arrest are irrelevant to the constitutional question.

The Government's remaining argument is that Mr. Cordova "possessed a firearm in this case while possessing a digital scale and hypodermic syringe and, by his own admission, attempting to 'score' drugs." Gov't Reh'g Resp. 18. Judge Ho likewise noted that the presentence report "contains information about his more recent use of dangerous drugs." Panel Op. 4. Mr. Cordova has not disputed what officers found in the truck or what he told them. *See* Opening Br. 3, 16. But these facts cannot sustain § 922(g)(1) as applied to him.

First, they are not what § 922(g)(1) punishes. The statute disarmed Mr. Cordova because of his convictions, years before the stop. The Government cannot justify that deprivation, or the prosecution that followed, with later events that no court had adjudicated. *See* Part III.A–B, *supra*.

Second, the Government never presented those facts to the district court as a reason to deny the motion. The court ruled the day the motion was filed. ROA.93–94. The Government's citations for these facts are to a presentence report prepared six weeks later. Gov't Reh'g Resp. 18 (citing ROA.274); ROA.271. The district court did not rely on them in ruling on the motion, and an appellate court

does not draw contested inferences from them in the first instance. *See Bost*, slip op. at 12 (on a motion to dismiss, "courts must look only at the predicate crime").

Third, drug use does not justify disarmament on this record. The Government did not charge Mr. Cordova under § 922(g)(3). *Hemani* rejected the Government's "effort to disarm any regular user of any controlled substance without any further showing," 608 U.S. at 795, and reserved, among other questions, prosecutions "accompanied by individualized proof that the defendant's use of marijuana (or any other drug) renders him a danger to himself or others," *id.* at 794. The Government offered no such proof here. It cannot obtain through § 922(g)(1), by pointing to a presentence report, the result it could not obtain under § 922(g)(3).

Fourth, the sentencing enhancement is not an adjudication that can justify disarmament. The district court found by a preponderance, over objection, that Mr. Cordova possessed the pistol in connection with another felony offense. ROA.229–30; ROA.275. The finding rested on his statement about going to the house and on the scale and syringe found in the back-seat area. ROA.273–75. The Government charged no drug offense. ROA.24–25. And the finding came after Mr. Cordova was disarmed, charged, and convicted. It is not the "pre-deprivation process" that *Hemani* describes. 608 U.S. at 791 n.6.

## V. Even if some disarmament were justified, the Government has not shown a tradition of disarming a person like Mr. Cordova for life.

### A. Duration is part of what the Government must justify.

Section 922(g)(1) "contains no time limit. So it imposes a lifetime ban on the possession of a firearm." Panel Op. 3 (Ho, J., concurring in the judgment). The Supreme Court describes its effect as "disarmament for life." *Hemani*, 608 U.S. at 777.

Whether a law burdens the right "to an extent beyond what was done at the founding" is part of the required analysis. *Id.* at 790 (quoting *Rahimi*, 602 U.S. at 692). *Rahimi* upheld § 922(g)(8) in part because, "like surety bonds of limited duration, Section 922(g)(8)'s restriction was temporary as applied to Rahimi." 602 U.S. at 699. Its holding is limited accordingly: a person found by a court to pose a credible threat "may be temporarily disarmed." *Id.* at 702. And it left open "whether the government may disarm an individual permanently." *Id.* at 713 (Gorsuch, J., concurring). The en banc Third Circuit holds that the Government's burden "encompasses the nature of the restriction imposed, the process used to impose it, and its duration," and it reserved "what, if anything, could later take a defendant out of that category." *Bost*, slip op. at 5, 14; *see id.* at 1 (Phipps, J., dissenting) (finding no analogue for "presumptive permanent disarmament").

Panel statements that the historical analogues were permanent, *e.g.*, *Diaz*, 116 F.4th at 469–71; *United States v. Mitchell*, No. 25-30438, 2026 WL 2507820 at *6 (5th Cir. Aug. 26, 2026), do not bind the en banc Court, and they cannot be squared with the history described below.

B. The historical practices were temporary or took only property.

Each tradition on which the Government has relied in § 922(g)(1) cases was limited in time or reached only property.

*Surety laws.* "Bonds could not be required for more than six months at a time, and an individual could obtain an exception if he needed his arms for self-defense or some other legitimate reason." *Rahimi*, 602 U.S. at 697.

*Going-armed laws.* The offender was punished with "forfeiture of the arms . . . and imprisonment." *Id.* (quoting 4 Blackstone 149). *Diaz* called that "permanent arms forfeiture." 116 F.4th at 470–71. But what the offender forfeited was the weapon. Laws of this kind "often prescribed the forfeiture of the specific weapon used to commit a firearms-related offense without affecting the perpetrator's right to keep and bear arms generally." *Range*, 124 F.4th at 231.

*Forfeiture and sentence.* Founding-era convicts "were prevented from reacquiring arms until they had finished serving their sentences." *United States v.*

*Contreras*, 125 F.4th 725, 732–33 (5th Cir. 2025) (quotation omitted). Then "a felon could acquire arms after completing his sentence and reintegrating into society." *Range*, 124 F.4th at 231. The D.C. Circuit recently upheld § 922(g)(1) on that limited ground, as "disarmament for the term of the sentence," and reserved whether a person who has served his sentence "may have a viable Second Amendment claim." *United States v. Richardson*, 188 F.4th 412, 419–20 (D.C. Cir. 2026). The en banc Third Circuit held on October 13, 2026, that § 922(g)(1) could not be applied to a man with a 2005 drunk-driving conviction, noting that "[t]he practice of permanently disarming felons only dates back to the 1960s" and that habitual drunkards confined under nineteenth-century laws "were restored to the status of a full rights-bearing citizen" once "safe" to "go at large." *Williams v. Att'y Gen.*, slip op. at 2, 19.

*Class-based disarmament.* Disarmament of groups thought dangerous ended when the reason for it did. "[M]any of England's disarmament laws were not permanent." Panel Op. 20 (Oldham, J., concurring in the judgment). Colonists disarmed in Massachusetts in 1637 had their rights restored "if they were found to be not dangerous." *Id.* at 21. And loyalists could recover their arms by taking an oath. *See* Part II.A, *supra*.

Apart from execution, the Government has identified no law in force at the Founding that barred a free citizen from possessing arms for life. *See Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting). There is simply "no historical analogue for the lifetime disarmament of an otherwise free citizen." *Range*, 124 F.4th at 249 (Phipps, J., concurring).

C. Mr. Cordova completed his sentence in 2017.

Mr. Cordova never served a sentence of confinement. He completed supervision in May 2017. ROA.276–77. By January 2024 he had been a free citizen, under no sentence of any court, for more than six and a half years. If the Court looks beyond the convictions, the record also shows that he was twenty at the time of the evading offense, that he earned a university degree, ROA.280, and that he was convicted of nothing between 2014 and the day of the stop, ROA.276–78.

Under every historical measure described above, his disability would have ended long before: when a surety bond lapsed, when his sentence ended, or on a showing that the danger had passed.

D. The question is properly before the en banc Court.

Judge Ho concluded that Mr. Cordova "does not challenge the validity of his lifetime disarmament," that his brief made only "a stray reference" to the passage of time, and that it offered no "legal authority or analysis." Panel Op. 4. With

respect, the argument was made at each stage, and the en banc Court should reach it.

The motion to dismiss argued that Founding-era laws "generally only prescribed forfeiture of the firearm, not re-arming once the sentence has been completed"; that Texas law does not "contain a lifetime ban on firearm possession"; and that "once Mr. Cordova completed his probation in 2017, he was eligible to re-arm himself five years later in 2022." ROA.44–45.

The brief relied on *Range* for the point that a Founding-era felon "could often rearm after completing his sentence and reintegrating into society," Opening Br. 11; argued that this Court "has not found that such a prohibition survives the lawful discharge of that sentence," *id.* at 15 & n.39; and asserted that people "who have paid their debt to society deserve the right to re-arm that they would have enjoyed during the Founding Era," *id.* at 17.

It is an argument, not a separate claim. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992); *accord Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995). Mr. Cordova's claim has always been that § 922(g)(1) violates the

Second Amendment as applied to him. Under *Rahimi* and *Hemani*, the extent of the burden, including its duration, is part of what the Government must justify. It is not a separate claim that a defendant must plead.

The Government has put duration at issue. Before the panel, the Government argued that "[p]ermanently disarming him fits neatly within our historical tradition." Gov't Panel Br. 31. It now relies on § 925(c), which its panel brief did not mention, as the answer to "any constitutional concerns about the breadth and duration of the restriction imposed by § 922(g)(1)." Gov't Reh'g Resp. 17. Having asked the en banc Court to decide whether the duration of the restriction is constitutional, the Government cannot object that Mr. Cordova addresses the same question.

The Court has discretion in any event. The en banc Court may decide "a pure question of law" not pressed before the panel. *New Orleans Depot Servs., Inc. v. Dir., OWCP*, 718 F.3d 384, 387–88 (5th Cir. 2013) (en banc) (quotation omitted). This is one.

## VI. The Court should reverse and direct dismissal of the indictment or, at a minimum, vacate and remand.

The district court denied the motion to dismiss without requiring the Government to carry its burden. The Government has had two opportunities since.

It has not identified a Founding-era analogue for disarming a person who fled from an officer, and it has offered no evidence about Mr. Cordova's flight.

When the Government fails to carry its burden in an as-applied challenge to § 922(g)(1), this Court has reversed. *See, e.g.*, *Hembree*, 165 F.4th 909; *Mitchell*, 160 F.4th 169; *Cockerham*, 162 F.4th 500. The Court should reverse the denial of the motion to dismiss, vacate the conviction and sentence, and remand with instructions to dismiss the indictment.

In the alternative, if the Court adopts a standard that calls for facts the record does not contain, it should vacate and remand for the district court to apply that standard in the first instance, with the burden on the Government. Mr. Cordova asked for that relief in his opening brief. Opening Br. 13–14. This Court has ordered it in a comparable case. *Debrow*, 183 F.4th at 408 (opinion of Higginson, J.) (vacating the denial of a motion to dismiss and remanding for the district court to reconsider the as-applied challenge in the first instance).

## CONCLUSION

The Court should reverse the district court's denial of Mr. Cordova's motion to dismiss, vacate his conviction and sentence, and remand with instructions to dismiss the indictment. In the alternative, the Court should vacate the judgment and remand for further proceedings in which the Government bears the burden of justifying Mr. Cordova's disarmament under the standard the Court adopts.

Respectfully submitted,

/s/ Lane A. Haygood
**Lane A. Haygood**
Texas State Bar No. 24066670
**HAYGOOD LAW FIRM**
620 N. Grant Ave., Suite 913
Odessa, Texas 79761
Tel: (432) 279-0411
lane@haygoodlawfirm.com
*Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I certify that on October 14, 2026, I electronically filed this brief with the Clerk of this Court using the CM/ECF system, which will serve a copy on all counsel of record.

/s/ Lane A. Haygood
**Lane A. Haygood**
*Counsel for Defendant–Appellant*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, it contains 12,923 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity (text), 12-point Equity (footnote), and Concourse (headings).

Dated: October 14, 2026

/s/ Lane A. Haygood
**Lane A. Haygood**
*Counsel for Defendant–Appellant*