# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 20, 2026

Lyle W. Cayce
Clerk

No. 24-50564

United States of America,

*Plaintiff—Appellee*,

*versus*

Peter Villa Cordova,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:24-CR-31-1

Before Haynes, Ho, and Oldham, *Circuit Judges*.

Per Curiam:

Peter Villa Cordova pled guilty to possessing a firearm after a felony conviction in violation of 18 U.S.C. § 922(g)(1).* His prior felony convictions include drug possession and evading arrest or detention with a motor vehicle.

* Cordova pled guilty without a written agreement. Here, all sides agree that Cordova's guilty plea did not waive his right to bring this appeal. That is because he raised his as-applied challenge to § 922(g)(1) in his motion to dismiss the indictment. *Cf. Class v. United States*, 583 U.S. 174, 178–82 (2018). And this court has allowed such challenges to proceed. *United States v. Gil*, No. 23-50525, 2024 WL 2186916 (5th Cir. May 15, 2024) (per curiam).

On appeal, he argues that § 922(g)(1) violates the Second Amendment to the Constitution, as applied to him.

This circuit has a well-trod approach to such challenges. *See United States v. Diaz*, 116 F.4th 458, 462, 471–72 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025). As we have explained, there is a "tradition of disarming individuals . . . whose underlying convictions stemmed from the threat and commission of violence with a firearm." *United States v. Bollock*, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam). We have extended such logic to disarming people convicted of violent offenses. *See id.*; *United States v. Arredondo*, No. 24-50386, 2025 WL 1249901, at *1 (5th Cir. Apr. 30, 2025) (per curiam) (robbery conviction); *United States v. Davis*, No. 24-20258, 2025 WL 958265, at *2 (5th Cir. Mar. 31, 2025) (per curiam) (misuse of firearms). Such cases explain that some offenders can pose a "credible threat to the physical safety of others." *United States v. Reyes*, 141 F.4th 682, 686 (5th Cir. 2025) (per curiam). And we have held that people pose just such a threat when they evade arrest in a motor vehicle. *See United States v. Simpson*, 152 F.4th 611, 614 (5th Cir. 2025).

That logic controls this case. Cordova engaged in a vehicular evasion of arrest. Given that "vehicular pursuits" are "often catastrophic," Cordova's decision to use a car to evade the police is probative of his dangerousness. *Cf. Lange v. California*, 594 U.S. 295, 324 (2021) (Roberts, C.J., concurring in the judgment); *United States v. Lee*, 989 F.2d 180, 183 (5th Cir. 1993) (per curiam). Cordova's decisions posed a risk to his fellow citizens and demonstrate that he poses a credible threat to the physical safety of others. Thus, his challenge to § 922(g)(1) fails.

AFFIRMED.

James C. Ho, *Circuit Judge*, concurring in the judgment:

The right to keep and bear arms under the Second Amendment is a fundamental civil right, comparable to other provisions of the Bill of Rights. *See*, *e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (describing the First, Second, Fourth, Fifth, and Sixth Amendments as the "civil-rights Amendments"); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49–50 n.10 (1961) (comparing "the commands of the First Amendment" to "the equally unqualified command of the Second Amendment").

Of course, violent criminals should be disarmed, detained, prosecuted, convicted, and incarcerated. *See*, *e.g.*, *United States v. Rahimi*, 117 F.4th 331, 335 (5th Cir. 2024) (Ho, J., concurring). But 18 U.S.C. § 922(g)(1) reaches far more broadly than that.

To begin with, § 922(g)(1) makes it a crime to possess a firearm for anyone convicted of any felony, so long as the person has been convicted of a crime that is "*punishable* by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1) (emphasis added).

Moreover, § 922(g)(1) contains no time limit. So it imposes a lifetime ban on the possession of a firearm. And it does so even if the person has never been sentenced to serve a single day in prison.

So it's not difficult to imagine how, depending on the circumstances, § 922(g)(1) could present serious constitutional questions.

To date, the Supreme Court has not addressed the validity of lifetime disarmament for individuals who have never been sentenced to a single day in prison. In *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court held only that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be *temporarily* disarmed consistent with the Second Amendment." *Id.* at 702 (emphasis added).

Justice Gorsuch pointedly noted in his concurrence that "[w]e do not resolve whether the government may disarm an individual permanently." *Id.* at 713 (Gorsuch, J., concurring).

And our court has been careful not to determine the validity of lifetime disarmament as a categorical matter, but based on the availability of "relevantly similar" historical practices. *United States v. Cockerham*, 162 F.4th 500, 505 (5th Cir. 2025). After all, "[o]ur analysis of the Second Amendment must be guided by history—not hoplophobia." *Id.* at 502. *See also*, *e.g.*, *Kanter v. Barr*, 919 F.3d 437, 461 (7th Cir. 2019) (Barrett, J., dissenting) ("history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class"); *Range v. Attorney General*, 124 F.4th 218, 249 (3rd Cir. 2024) (Phipps, J., concurring) ("I see no historical analogue for the lifetime disarmament of an otherwise free citizen").

Peter Cordova was convicted a decade before the events of this case. Rightly or wrongly, he was not sentenced to serve a single day in prison. And his term of probation ended seven years before he was found in possession of a firearm in violation of § 922(g)(1).

But Cordova does not challenge the validity of his lifetime disarmament under § 922(g)(1) in this appeal. He makes a stray reference in his brief to the lapse of time between his conviction and his arrest under § 922(g)(1) ten years later. But he fails to provide any legal authority or analysis indicating that this ten-year lapse raises concerns under the Second Amendment. Perhaps that's because his presentence report contains information about his more recent use of dangerous drugs. *See generally United States v. Connelly*, 117 F.4th 269, 277 (5th Cir. 2024).

* * *

Red flag laws present serious constitutional problems, because they disarm individuals without affording them the protections that our Constitution guarantees to those accused of a crime. *See*, *e.g.*, David B. Kopel, *Red Flag Laws: Proceed with Caution*, 45 L. & Psych. Rev. 39 (2021); Matthew Larosiere & Joseph G.S. Greenlee, *Red Flag Laws Raise Red Flags of Their Own*, 45 L. & Psych. Rev. 155 (2021); John R. Richardson, *Red Flag Laws and Procedural Due Process: Analyzing Utah Legislation*, 2021 Utah L. Rev. 743 (2021); Joseph Blocher & Jacob D. Charles, *Firearms, Extreme Risk, and Legal Design: "Red Flag" Laws and Due Process*, 106 Va. L. Rev. 1285 (2020).

But at least red flag laws impose only temporary disarmament. Section 922(g)(1), by contrast, disarms individuals for the rest of their lives, regardless of whether the individual has been convicted of a violent crime or spent a single day in prison.

That said, this case does not present a challenge to lifetime disarmament under § 922(g)(1). I accordingly concur in the judgment.

Andrew S. Oldham, *Circuit Judge*, concurring in the judgment:

The Second Amendment reflects a fundamental, God-given right that long predates our Nation's Founding:

> This may be considered as the true palladium of liberty . . . . The right to self defence is the first law of nature: in most governments it has been the study of rulers to confine the right within the narrowest limits possible. Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.

1 St. George Tucker, Blackstone's Commentaries app. 300 (1803). Our Republic was born in an armed rebellion 250 years ago. And since then, our Nation has developed and celebrated a rich historical tradition of firearms ownership.

Our court's understanding of the Second Amendment, by contrast, is "historically bankrupt." *United States v. Wilson*, ___ F.4th ___, No. 24-10633, 2026 WL 1190659, at *5 (5th Cir. Apr. 30, 2026) (Oldham, J., dissenting from denial of rehearing en banc). Particularly unfortunate among our mistakes is a case called *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), which is the accidental font of all our felon-in-possession precedent. *Diaz* was wrong on the day it was decided. And it gets more wrong with each passing day. At best, it has led panels (as here) to gloss over doctrinal complications. And at worst, it has led to nonsensical interpretations of the Second Amendment and tortured applications to 18 U.S.C. § 922(g)(1).

Rather than join the White Rabbit for another journey into our circuit's § 922(g)(1) Wonderland, it is time to say enough is enough. *Diaz* must go.

# I

## A

Start with *New York State Pistol & Rifle Association v. Bruen*, 597 U.S. 1 (2022). *Bruen* explained that courts cannot just balance away an individual's Second Amendment right. *Id.* at 26. Instead, courts must recognize that the Founders already balanced the relevant interests for us when they wrote the Second Amendment. *Ibid.* The people chose to protect their right to keep and bear arms, so courts cannot second-guess that decision and substitute their own views on desirable firearms policy. *Ibid.*

Consistent with that reasoning, *Bruen* laid out the governing Second Amendment test. If the Amendment covers an individual's conduct, the Government must show that any regulation burdening that conduct is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. As part of that analysis, a court does not need to find an exact historical analogue to a modern restriction. *United States v. Rahimi*, 602 U.S. 680, 691–92 (2024). Courts instead should look to "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692.

## B

In the years after *Bruen*, courts considered Second Amendment challenges to a range of laws. One of the challenged laws was 18 U.S.C. § 922(g)(1). Our court addressed that challenge in *Diaz*. I discuss (1) *Diaz* and (2) its flaws.

### 1

When police conducted a traffic stop of Ronnie Diaz, Jr.'s car, they noticed a strong marijuana odor. *Diaz*, 116 F.4th at 462. So they asked Diaz to step out of the vehicle. *Ibid.* Diaz admitted that he "had ammunition in his

pocket" and said that "he was a convicted felon." *Ibid.* When the police searched the car, they found a pistol, methamphetamine, counterfeit Xanax, and heroin. *Ibid.* They later discovered that Diaz had prior felony convictions for theft and burglary of a motor vehicle. *Ibid.*

The Government charged Diaz with "being a felon in possession of a firearm," in violation of § 922(g)(1), among other things. *Ibid.* After he was found guilty, Diaz appealed, arguing that § 922(g)(1) was inconsistent with the Second Amendment.

The *Diaz* panel rejected that claim on appeal. In doing so, the panel made two key moves.

First, the panel said that, in evaluating a challenge to § 922(g)(1), courts should look to whether the underlying crime was punished by death at the Founding. *Id.* at 467–69. Because the Founders often put thieves to death at the Founding, the *Diaz* panel thought that any thief today could be disarmed. The panel said it "could stop [t]here," since the "punishment-focused laws . . . demonstrate a historical tradition of severely punishing people like Diaz." *Id.* at 470. But the panel noted other circuits had cast doubt on the death-penalty justification it just embraced. *Ibid.* That's because "Founding-era governments punish[ing] some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Range v. Att'y Gen. U.S. of Am.*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc).[1]

[1] *Range* has a long history. *Range v. Att'y Gen. U.S. of Am.*, 53 F.4th 262 (3d Cir. 2022) ("*Range I*"), *vacated, reh'g en banc granted*, 56 F.4th 992 (3d Cir. 2023) ("*Range II*"), *rev'd en banc*, 69 F.4th 96 (3d Cir. 2023) (en banc) ("*Range III*"), *cert. granted, judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024) ("*Range IV*"), *remanded sub nom. Range v. Att'y Gen. U.S. of Am.*, 124 F.4th 218 (3d Cir. 2024) ("*Range V*"). For the sake of simplicity, I use the abbreviations listed in these parentheticals throughout this opinion.

So the panel also turned to a second justification: historical evidence. *Diaz*, 116 F.4th at 470. And not just any history, but only the history the parties identified. The panel looked to two unadopted proposals that obliquely referenced disarming criminals. *Ibid*. You might reasonably think such thin non-evidence from *unadopted* proposals in just two States would show the right to keep and bear arms was not limited to law-abiding citizens. But the *Diaz* panel reached the opposite conclusion—it only explained that the proposals "help to illuminate the 'public understanding' of the Second Amendment," and that such "illumination" meant § 922(g)(1) was constitutional. *Ibid.* The *Diaz* panel also looked to four "going armed" laws that prohibited people from menacing others with firearms. *Id.* at 470–71. Because those laws punished some conduct with disarmament, *Diaz* asserted that § 922(g)(1)'s disarmament scheme was also permissible. *Id.* at 471 & n.5.

2

There are at least five reasons that this court should jettison *Diaz*.

*First*, even if we assume that *Diaz* achieves the right result, there is no way to tell which of its two analytical prongs matters. Is it enough that a crime was punishable by death at the Founding? Or do courts need to do an independent, *Bruen*-style historical analysis? *Diaz*'s structure—the majority saying it "could stop" with its conclusion that if a crime was punishable by death at the Founding, it is punishable by disarmament now—suggests that all a court evaluating a § 922(g) challenge must do is look at whether the underlying offense was punishable by death. *Id.* at 471. But *Diaz* itself then casts doubt on its own death-penalty rationale and conducts an independent historical analysis anyway. So perhaps an independent analysis is necessary. Which is it? *Diaz* doesn't say.

This vacuum has had predictable results. At times, courts follow *Diaz* prong one to hold that if a crime was punishable by death at the Founding,

courts today can disarm offenders who commit the same offense. *See United States v. Quiroz*, 125 F.4th 713, 724–25 (5th Cir. 2025), *cert. denied*, 146 S. Ct. 146 (2025). But at other times, courts appear to look beyond *Diaz*'s prong one to consider the Nation's history of disarming criminals instead. *See United States v. Cockerham*, 162 F.4th 500, 504 (5th Cir. 2025). In the latter category of cases, the death penalty argument that appears to have been dispositive in *Diaz* simply disappears.

*Second*, *Diaz*'s discussion of the death penalty is wrong. As a logical matter, Founding-era decisions to execute individuals convicted of various crimes do not mean that a government—then or now—also could constitutionally strip a felon of his rights if they were not executed. If that were right, we would be able to strip a thief of his First, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Amendment rights, too. The better-than-death rule is not the law—and it never has been.

And, as a historical matter, the argument makes no sense. Felons could "repurchase arms" after successfully completing their sentences and reintegrating in society. *Range III*, 69 F.4th at 127–28 (KRAUSE, J., dissenting). So it is difficult to say that a person's decision to commit a felony meant someone could be disarmed—the historical record seems to show the exact opposite. What's more, as then-Judge Barrett explained five years before *Diaz*, "[c]apital punishment [at the Founding] was less pervasive than one might think," and even where imposed, the sentence was rarely carried out. *Kanter v. Barr*, 919 F.3d 437, 459–61 (7th Cir. 2019) (BARRETT, J., dissenting), *abrogated by Bruen*, 597 U.S. 1 (2022). And the analogous "civil death," *i.e.*, the associated loss of rights, was also rarely carried out. *Id.* at 461. The upshot? Even at the Founding, those convicted of crimes like theft and burglary did not always suffer a permanent loss of rights.

*Third*, *Diaz*'s other analytical tentpole—the historical-analogue inquiry—is also shoddy. For one, *Diaz* itself did not perform any independent historical inquiry. Instead, it cribbed several examples from the Government's brief and then declared, without analysis, that those examples resolved the dispute.

But even a cursory analysis shows why this approach does not work. As I've explained, the *Diaz* majority looked at two losing proposals from colonial debates—one is a speech and the other is a defeated amendment—and then said those losing proposals justify disarming thieves. How two losing arguments yield a winner is beyond me.

And *Diaz*'s reference to four "going armed" laws is unhelpful. The logic was that such laws were enough in *Rahimi*—which was a case about a different statute. The majority provided no significant analysis of why those laws were analogous to § 922(g)(1) other than to say both allowed for disarmament. And that proves too much. It suggests that any law allowing for disarmament would be constitutional in all contexts merely because a separate, unrelated historical law allowed for disarmament. But that is not the law. As in *Rahimi*, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 602 U.S. at 692. The *Diaz* majority did not even identify what the principles underpinning our regulatory tradition were, let alone analyze whether § 922(g)(1) was consistent with those principles.

*Fourth*, *Diaz* is at best unclear about whether courts can look only to a specific § 922(g)(1) predicate offense or may consider the defendant's broader conduct. From my reading, *Diaz* is ambiguous: It mentions that Diaz has "various misdemeanors" as well as felony convictions for theft and

attempted burglary. 116 F.4th at 462. Then, it says that § 922(g)(1) is applicable to "people like Diaz." *Id.* at 471 n.7.

This ambiguity has yielded confusion. Recently, we've said that this circuit only allows consideration of "the nature of the predicate offense." *Cockerham*, 162 F.4th at 507 (quotation omitted). That means that courts can evaluate only the conviction giving rise to the § 922(g)(1) offense. To be sure, there is precedent supporting that view. *United States v. Hernandez*, 159 F.4th 425, 428 (5th Cir. 2025) (per curiam).

But there is also a recent (pre-*Hernandez*) case standing for the exact opposite proposition: *United States v. Alaniz*, 146 F.4th 1240, 1242 (5th Cir. 2025) (per curiam) (explaining that looking to "a defendant's entire criminal record . . . makes sense, given that the [G]overnment doesn't need to prove the specific predicate felony in securing a conviction under § 922(g)(1) in the first place"). Notably, *Alaniz* demands a different mode of analysis of the same question this Court confronted in *Cockerham* and *Hernandez*.

And it gets even worse. *Alaniz* itself was preceded by *United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025). There, the court said that "[w]e thus do not embrace the view that courts should 'look beyond' a defendant's predicate conviction 'and assess whether the felon's history or characteristics make him likely to misuse firearms.'" *Id.* at 318 (quotation omitted). So that would appear to support the *Hernandez-Cockerham* rule.

But *Kimble* was preceded by *United States v. Reyes*, 141 F.4th 682 (5th Cir. 2025) (per curiam). And in *Reyes*, this court examined the defendant's entire criminal history—both those convictions at the time of the guilty plea and those that the Government discovered after the fact. *See id.* at 686–87. And *Reyes* is the earliest on-point decision. That has obvious implications for the rule of orderliness: "It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent

an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." *United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014) (quotation omitted). As one of our colleagues has pointed out in a comment on what crimes a court can consider, "[b]ecause the *Kimble* panel was without authority to overrule *Reyes*, I would conclude that *Reyes* is controlling." *United States v. Orozco*, No. 24-50104, 2025 WL 2623429, at *3 (5th Cir. Sept. 11, 2025) (Graves, J., dissenting).

As best I can tell, the *Kimble* panel (which kicked-off the *Kimble-Hernandez-Cockerham* rule) misread *Diaz*. True, Diaz referenced "prior convictions." *Diaz*, 116 F.4th at 267. Kimble interpreted that to mean the relevant predicate offense is the defendant's "'prior convictions that are punishable by imprisonment for a term exceeding one year,' not unproven conduct charged contemporaneously with a defendant's (g)(1) indictment or prior conduct that did not result in a felony conviction." *Kimble*, 142 F.4th at 318 (quoting *Diaz*, 116 F.4th at 467). But as I read *Diaz*, the panel was just quoting § 922(g)(1) and then applying the traditional Second Amendment inquiry of whether there was a relevant historical analogue. *See id.* at 321 (Graves, J., concurring in part and in the judgment) (making the same point). It "said nothing" about unproven conduct, additional uncharged conduct, or whether a given offender was "dangerous." *See ibid.*

And insofar as we read *Diaz* to look only to charged predicate offenses, we would (again) be going against the weight of the circuits. Two circuits have issued well-reasoned opinions explaining that courts can look beyond the charged predicates. *See Pitsilides v. Barr*, 128 F.4th 203, 212 (3d Cir. 2025); *United States v. Williams*, 113 F.4th 637, 657–58 (6th Cir. 2024). And then-Judge Barrett has made the same argument, albeit in dissent. *Kanter*, 919 F.3d at 468 (7th Cir. 2019) (Barrett, J., dissenting) (suggesting that courts should look beyond the "conviction" and assess whether the felon's "history or characteristics make him likely to misuse firearms"). If our

circuit is going to go its own way, we should explain why in a clear and coherent way.

*Fifth*, even setting all that aside, *Diaz* looks even worse when compared to the other thoughtful opinions rendered by our sister circuits. Since *Bruen* and *Rahimi*, thoughtful jurists around our Nation have encountered challenging questions about how the Second Amendment interacts with our criminal justice scheme. And these courts have issued well-reasoned, lengthy opinions combing over complex history. *See Range I*, 53 F.4th at 276; *Range III*, 69 F.4th at 103–06; *Range IV*, 124 F.4th at 230–31; *Williams*, 113 F.4th at 653; *United States v. Duarte*, 101 F.4th 657 (9th Cir.), *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024), *and on reh'g en banc*, 137 F.4th 743 (9th Cir. 2025). *Diaz* pales in comparison to its peers.

*

In sum, the time has come to discard *Diaz* and to embrace a better Second Amendment standard.

II

What should the standard be? I do not purport to have all the answers. But I know from experience that it is difficult to convince our en banc court to overturn a panel precedent without a clear proposal for what should take its place. So as a working hypothesis, I would propose a dangerousness standard. It would ensure that any decision to disarm any American "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

Firearms stem from a rich tradition. I discuss (A) English history dating back to the origin of guns. As with many things in English constitutional history, however, (B) the key period was the seventeenth

century. (C) This history is mirrored in early American experience. And (D) our historical understanding was codified at the founding.

A

Guns are so old that no one is sure when they were invented. One guess is 1100 A.D., the approximate date of a Sichuan sculpture showing a figure with a firearm. KENNETH CHASE, FIREARMS: A GLOBAL HISTORY TO 1700 1 (2003). Another guess is 1200 A.D., which comes from an 800-year-old gun that archaeologists found in Manchuria. *Ibid.* What we do know is that firearms were in use in China during the early days of the last millennium, and that they spread quickly: to Europe by the first half of the 1300s; to Arabia perhaps a few years later; and to what is now Turkey, Iran, and India by the 1400s. *Ibid.*

Early on, firearms were primarily used for breaching city walls, such as those of Saint-Saveur-le-Vicomte in France in 1374. *Id.* at 59. Over the next three centuries, military use of firearms became commonplace: They played pivotal roles in the English conquest of Normandy, the Spanish siege of Granada, and the famed defeat of the Spanish Armada. *Id.* at 60–72. Civilians, too, began to use firearms. Indeed, many throughout England found what King Henry VIII would call "newfangled and wanton pleasure" in firearms. LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 106 (2016). Guns also were a means of creating, protecting, and flaunting wealth. *Id.* at 106–10. In these early years, firearms were tools of both military conquest and social transformation.

The Second Amendment incorporated this long tradition of firearms usage. But in understanding the contours of this tradition, "not all history is created equal." *Bruen*, 597 U.S. at 34. Instead, some history is particularly instructive. This includes English history, which informs the rights recognized by the Founders; colonial history, which shows how the earliest

Americans interacted with firearms; and ratification history, which reveals what the Second Amendment meant at the time it was enacted. *Id.* at 34–35.

Two important themes run throughout this history. The first is that governments could disarm individuals they deemed dangerous. And the second is that who was deemed dangerous (or why they were deemed dangerous) changed over time.

B

These themes were vividly displayed throughout seventeenth-century England. The nation in that time was rocked by religious strife. As warring factions variously assumed power, they used the same tactic: disarming individuals they considered dangerous. Their rationale was that some people posed a threat to peace, so Parliament and the King could take away their weapons. And at common law, England restricted citizens from owning guns if they failed to keep the peace. So while different warring factions considered different people to be dangerous, all agreed that the legality of disarming seventeenth-century Englishmen turned on dangerousness.[2]

Start with statutes. In the first half of the seventeenth century, Stuart King Charles I was facing revolution. *See generally* CONRAD RUSSELL, THE ORIGINS OF THE ENGLISH CIVIL WAR 1–5 (1973). He had fought two bloody campaigns against Presbyterians in Scotland and faced an Irish rebellion that saw Catholics murder thousands of Protestants. *See generally* MARK CHARLES FISSEL, THE BISHOPS' WARS: CHARLES I'S

---

[2] Of course, the tradition of disarming the dangerous may go back even further. In 1328, for example, Parliament passed the Statute of Northampton. That document made carrying arms "in such a manner as will naturally cause a terror to the people" a criminal offense. 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN ch. 63, §§ 4 266 (1716; 6th ed. 1787). The guilty would have to "forfeit their armour to the king." *Ibid.*

CAMPAIGNS AGAINST SCOTLAND, 1638-1640 1–3 (1994). Charles's unpopularity and incompetence, along with his rumored Catholic sympathies, led to civil war. When Charles lost the war (and his head), what remained of the English government was known as the Rump Parliament. BLAIR WORDEN, THE RUMP PARLIAMENT: 1648-1653 4 (1977). This body was wary that Catholics would revolt and put Charles's relatives on the throne, so it passed the Militia Act. That statute authorized officials to "disarm and secure (by Imprisonment or otherwise) all Papists, and other ill-affected persons" who demonstrate that they were "against this present Parliament or against this present Government." An Act for Setling of the Militia of the Commonwealth of England, (1650) I ACTS & ORDS. INTERREGNUM 399 (Eng.). The Act also sought to protect England from "all tending to the utter over-throw of the Safety of the Nation," including by repressing "Designs, Practises, secret and suspitious Meetings of disaffected persons." *Id.* at 397, 399. The Rump Parliament saw Catholics as a threat to the physical safety of the country and its people, so it disarmed them.

When Oliver Cromwell dissolved the Rump Parliament, he too disarmed those he saw as dangerous to peace. Cromwell believed that Catholics and Monarchists were working against him throughout England, so he allowed London officials to "seize, disarm, and slay all who levy forces against Government." 8 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, 1655, at 43–44 (Mary Anne Everett Green ed., London, Longmans & Co. et al. 1881). Once again, the threat of internal strife called for the disarmament of those perceived as dangerous.

After Cromwell died and the Convention Parliament declared Charles Stuart to be Charles II, the trend of disarming the supposedly dangerous continued. Just like his predecessors, Charles II began disarming his religious and political opponents. *See* Joseph G.S. Greenlee, *Disarming the Dangerous:*

*The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 7–21 (2024). He sought to disarm people who were "[n]otoriously known to be of ill Principles," had "shewn any Disaffection," or had "disturbed the public Peace." *Id.* at 12–13 (quoting William Phillips, *The Lords-Lieutenant of Shropshire*, in 4 Transactions of the Shropshire Archaeological and Natural History Society, ser. 3, 141, 156 (1904)). Thus, officials could disarm anyone who disturbed the public or otherwise posed a threat.

One such group was known as the Fifth Monarchists. Members of this group were convinced the restoration of Stuart monarchs would delay the arrival of the fifth monarchy prophesied in the Book of Daniel, *i.e.* the Kingdom of God. *Id.* at 14. When approximately fifty such rabble-rousers attempted to seize London, the King put down the rebellion. In response, Parliament passed a series of orders that disarmed persons "notoriously knowne to be of ill principles." *Ibid.* (quoting Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 45 (1994)).

The tradition of disarming the dangerous did not die with Charles II, who passed in 1685. Instead, his Catholic brother James II (& VII) assumed the throne and began disarming his enemies, who were Protestants. James II began in Ireland, disarming a Protestant militia, before attempting to disarm political dissidents. Malcolm, *supra*, at 102–06; Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 403 (2019). While the religious valence was flipped from the days of Charles I, the logic was the same: Some people were too dangerous to have weapons, so the Government could lawfully take their guns.

After James II was removed in the Glorious Revolution, Parliament adopted the English Bill of Rights. O'Scannlain, *supra*, at 404–05. That document granted arms only to Protestants. *Ibid.* One of the Bill's chief grievances was that James II "endeavour[ed] to subvert and extirpate the Protestant religion" when he "caus[ed] several good subjects being Protestants to be disarmed at the same time when papists were both armed and employed." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M. Sess. 2, c.2 (1689) (Eng. & Wales). To address that grievance, the Bill of Rights stated "[t]hat the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law." *Ibid.* In Parliament's view, Catholics were too dangerous to have weapons, but Protestants could have arms for their own defense. The idea was that this asymmetry would prevent violence and stabilize the country. *See Kanter* 919 F.3d at 456–57 (Barrett, J., dissenting).

The idea that law could restrain dangerous individuals also surfaced in English common law. In particular, English surety regimes embraced this principle. If a magistrate thought an individual would breach the peace, he could require the potential offender to post a bond. See 4 W. Blackstone, Commentaries on the Laws of England 252–53 (10th ed. 1787). If the offender did breach the peace, he forfeited the bond. English common law also allowed for disarmament. Take, for example, *Sir John Knight's Case* (1686) 87 Eng. Rep. 75 (KB). There, the King's Bench explained that individuals who sought to "terrify the King's subjects" could not "walk about the streets armed with guns." *Id.* at 76. Doing so would mean the perpetrator would "forfeit his armour" and risk "imprisonment at the King's pleasure." *Ibid.* Thus, individuals whose posed a threat to public safety could be disarmed.

*

All told, throughout the seventeenth century, there was little on which the warring English factions saw eye-to-eye. Religion, politics, and even the very system of government were up for grabs. But all agreed that dangerous people could be disarmed. Importantly, however, English history also confirms that who was considered dangerous (and why) changed over time. First the Protestants, then the Catholics; first the Monarchists, then the Fifth Monarchists; and so on. And dangerousness did not just change with the political and religious winds. Dangerousness could also change as to one person in one time because many of England's disarmament laws were not permanent. Instead, many only forbade disloyal subjects from owning weapons. *See, e.g.*, An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M. ch. 15, § 3 (1688); An Act for the More Effectual Disarming the Highlands in Scotland, 1 Geo. 1 c. 54, (1765), *in* THE STATUTES AT LARGE, vol. 18, ch. 39, § 1 (Joseph Bentham, ed., 1765). But if the individual was willing to swear an oath to King and country, he was no longer considered dangerous. *See Williams*, 113 F.4th at 651–52.

Thus, these two themes—disarmament of the dangerous, and the ever-changing definition of dangerousness—defined seventeenth century England. This evidence is "particularly instructive" in defining the scope of our Second Amendment. *Bruen*, 597 U.S. at 42.

C

Similar themes ran through early American history. After all, the "people of the colonies [were] descendants of the Englishmen," "devoted to liberty . . . according to English ideas and on English principles." Edmund Burke, Speech to Parliament on Reconciliation with the American Colonies, available at https://perma.cc/YJS3-AR4X. In the colonies, various factions

were in the crosshairs at various times: libelers, religious groups, indentured servants, and loyalists. So again, who was considered dangerous and why changed over time.[3] But as in England, those considered dangerous could be disarmed.

Perhaps the earliest example of this tendency occurred in 1637. The Massachusetts Bay Colony ordered a group of "seditious libell[ers]" to surrender their arms to the colonial government. 1 Records of the Governor and Company of the Massachusetts Bay in New England 211–12 (Nathaniel B. Shurtleff ed., Boston, William White 1853). As was the case across the pond, colonists could still get their guns back: They could "acknowledg" their "sinn" and "evill" before two magistrates. *Id.* at 212. If they did so, they were "thereby freed from delivering in their armes." *Ibid.* The colony thus set out a general rule: Those who threatened the young enterprise could be disarmed, but if they were found to be not dangerous, their rights were restored.

[3] Colonial governments also engaged in odious practices that would be obviously illegal today, such as race discrimination. *See* Greenlee, *supra*, at 26; *Range I*, 53 F.4th at 276; *Williams*, 113 F.4th at 653 n.10. There is currently a debate about whether these laws are relevant to the Second Amendment's meaning. *Cf.* Tr. of Oral Arg. at 62, *Wolford v. Lopez*, 23-16164 (U.S. Jan. 20, 2026). There are good arguments that they are not, since at the Founding many racial minorities were (wrongly) excluded from those who had rights. *Cf. ibid.* So, the logic goes, such restrictions say nothing about whether the government can prohibit a person who obviously has the right to keep and bear arms from keeping and bearing those arms. *See* Greenlee, *supra*, at 26. And in any event, such laws only further demonstrate that the colonial governments thought they could disarm certain dangerous individuals. *Cf. ibid.*; Nicholas J. Johnson, David B. Kopel, George A. Mocsary, E. Gregory Wallace & Donald Kilmer, Firearms Law and the Second Amendment: Regulation, Rights and Policy 439–40 (3d ed. 2022). Governments in England and America obviously have been wrong in their dangerousness determinations over time—sometimes horrifically so. But the point for present purposes is that the dangerousness principle has deep historical roots, and who was considered dangerous has changed over time.

Religious strife also precipitated rounds of disarmament. During the French and Indian War, which pitted the Protestant British against the Catholic French, Protestant colonists feared that their Catholic counterparts would side with France. *See United States v. Jackson*, 85 F.4th 468, 471 (8th Cir. 2023) (Stras, J., dissenting from denial of rehearing en banc); *Williams*, 113 F.4th at 653. So they sought to disarm Catholics.

Several laws illustrate this trend. The Pennsylvania assembly, for instance, explained that "all arms, military accoutrements, gunpowder and ammunition of what kind soever, any papist or reputed papist within this province hath . . . shall be taken." An Act for Forming and Regulating the Militia of the Province of Pennsylvania, *reprinted in* 5 The Statutes at Large of Pennsylvania from 1682 to 1801, 609, 627 (Wm. Stanley Ray ed. 1898). So too did the Virginia assembly "disarm[] Papists, and reputed Papists" who refused to "take the oaths to the government." An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government, *reprinted in* 7 William Waller Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia ch. 4, 35 (Richmond, Franklin Press 1820). Their logic: It was "dangerous at this time to permit Papists to be armed." *Ibid.*; *see also Williams*, 113 F.4th at 653 (discussing these laws). These statutes illustrate how colonial governments disarmed groups that they perceived as dangerous to the state.

But religious differences were not the only place where purported danger lurked. One key source of supposed peril were indentured servants. Indentured servitude was a form of bonded labor common at the Founding. Mary Sarah Bilder, *The Struggle over Immigration: Indentured Servants, Slaves, and Articles of Commerce*, 61 Mo. L. Rev. 743, 752 (1995–96). While arrangements could vary, most commonly a master would fund a servant's

journey to the New World in exchange for years of work without significant compensation.[4]

Early settlers had at least some reason to fear indentured servants. They could be dangerous because many were serving criminal sentences—or, in the parlance of *Sir John Knight's Case*, "at the King's pleasure." 87 Eng. Rep. at 75. A stint working as an indentured servant could serve as a form of exile, a bonded existence in lieu of prison. Bilder, *supra*, at 756. The English government sent many English, Irish, and Scottish convicts to the American colonies. *Ibid.* And the number grew so large that Virginians complained to the King of the "great danger and disrepute" that was brought by "frequent sending thither of ffelons and other Condemned Persons." 1 Acts of Privy Council of England 553 (W.L. Grant & James Munro eds., 1908). The King relented, at least for a while. *Ibid.* But the colonists' concerns remained. Benjamin Franklin, for example, decried the practice: "[W]hat good mother besides, would introduce thieves and criminals into the company of her children, to corrupt and disgrace them." Benjamin Franklin, *To the Printer of the* London Chronicle, London Chronicle, May 9, 1759, https://perma.cc/3KJZ-AD22. To American colonists, the danger posed by indentured servants was clear.

Disarmament laws seemed to be a potential solution to this danger. In 1756, for example, Georgia prohibited indentured servants "to have or use any fire Arms or other offensive Weapon" except under limited conditions.

[4] The servant was said to be "indentured" because the contract for his work was "by deed indented," meaning it was originally part of a set of two identical agreements printed on a single sheet of paper. Bilder, *supra*, at 752 n.24 (quoting James Curtis Ballagh, White Servitude in the Colony of Virginia: A Study of Indentured Labor in the American Colonies 34 (1895)). After the parties signed it, they would cut the contract in half, such that both master and the now-indentured servant would have their own copy.

18 Allen D. Candler, The Colonial Records of the State of Georgia 190–91 (1904). And when an indentured servant fulfilled his contract—and thus proved that he was not dangerous—the master was often required to provide the formerly indentured servant with a weapon. Laws of North Carolina—1715, ch. 46, *in* The Earliest Printed Laws of North Carolina, 1669-1751 63 (John D. Cushing, ed., Wilmington, Del.: Michael Glazier, Inc., 1977) (requiring that a master provide "a good well-fixed Gun"). This arrangement tracked the English history: The law denied guns to those considered dangerous and restored them to those who proved themselves trustworthy.

Revolutionary America mirrored the themes English history established. The concept of who was dangerous and why again changed. This time, the threat consisted of those who remained loyal to King George. And as before, the early American governments wasted no time in disarming the dangerous loyalists.

This practice began during the early days of the Revolution. In March 1776, the Massachusetts Bay Colony disarmed those "who are notoriously disaffected to the cause of America, or who have not associated and refuse to associate to defend by Arms these United Colonies." An Act for the Executing in the Colony of the Massachusetts-Bay, in New-England, One Resolve of Mar. 14, 1776, ch. 7, 1775 Mass. Acts 31, 31–35 (1776). And the Pennsylvania General Assembly explained that if a white male inhabitant refused to take a loyalty oath to Pennsylvania, he "shall be disarmed by the Lieutenant or Sub-Lieutenants of the city or counties respectively." An Act, Obliging the Male White Inhabitants of This State to Give Assurances of Allegiance to the Same, ch. 21, §§ 2 & 4, 1777 Pa. Laws 37, 37–39 (1779). Likewise, in Virginia, the free male inhabitants who refused allegiance to Virginia were labeled "recusants." An Act to Oblige the Free Male Inhabitants of This State Above a Certain Age to Give Assurances of

Allegiance to the Same, ch. 3, 1777 Va. Acts 8, 8–9. And what happened to "recusants?" *Ibid.* The "county lieutenant, or chief commanding officer of the militia" was "authorized and directed forthwith to cause such recusants to be disarmed." *Ibid*. In other colonies, the trend was much the same. *See* Greenlee, *supra*, at 49–63.

In sum, colonial America shared the mother country's pattern of ever-shifting definitions of dangerousness. Seditious libelers, Catholics, indentured servants, and loyalists bore the dangerousness label at various times and for various reasons. As in England, the government consistently disarmed the dangerous (even if the definition of dangerous was inconsistent). And as in England, those who were considered dangerous could take loyalty oaths and restore their rights.

D

Following the American Revolution, the idea of disarmament was incorporated into the Second Amendment. During the ratification debates, the Anti-Federalists objected that the Constitution did not expressly guarantee foundational rights, including the right to bear arms. So, they demanded that the Constitution protect these rights. That demand, and the debates that followed, produced the Second Amendment. These debates show that the Constitution's framers incorporated into the Second Amendment the principle that government could disarm dangerous people. Just as importantly, however, the debates narrowed the concept of dangerousness to certain dangerous criminals.

The debates in three soon-to-be States are illustrative. *See Range V*, 124 F.4th at 244 (Matey, J., concurring); *Williams*, 113 F.4th at 654–55.

In Massachusetts, Samuel Adams offered an amendment to say the Constitution "never [be] construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their

own arms." 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 681 (1971). By referring to "peaceable citizens," Adams sought to protect the rights of those who were not dangerous. *See Jackson*, 85 F.4th at 475–76 (STRAS, J., dissenting from the denial of rehearing en banc) (citing *Kanter*, 919 F.3d at 455–56 (BARRETT, J., dissenting)). After all, "peaceable citizens" are just those that are "not violent . . . bloody . . . quarrelsome . . . [or] turbulent." *Ibid.* (quoting *Kanter*, 919 F.3d at 455–56 (BARRETT, J., dissenting)); *see also Williams*, 113 F.4th at 654 (similar). Adams' proposal contained the same restriction present across English and colonial history.

The same was true in Pennsylvania. The Anti-Federalists proposed an amendment stating, in relevant part, that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 SCHWARTZ, *supra*, at 665.

This provision could be read to allow the government to disarm anyone convicted of a crime, no matter how minor. Such a reading would involve reading the amendment's use of "or" as disjunctive: The government can disarm someone for crimes committed or, alternatively, because he poses a "danger of public injury." *Ibid.* But another way to read this proposal, and one that comports with English and colonial tradition, is to permit the government to disarm individuals only for dangerous crimes. *Kanter*, 919 F.3d at 456 (BARRETT, J., dissenting). Under this view, the clause about "crimes committed" refers to violent crimes, and the provision about "real danger of public injury" serves as a catch-all covering bad acts that were not criminal at the time. *Ibid.*

There are at least two reasons that the latter reading is the better one. First, the debate about this proposal concerned only whether it would cover insurrection—the same kind of dangerous crime that haunted rulers as far

back as Charles I. *See* Greenlee, *supra*, at 75–76. So that context is strong evidence that the Pennsylvania legislature was concerned with the same kind of public revolts that had troubled generations past. Second, a contemporary commentator explained that the Pennsylvania proposal concerned "actual rebellion" and "dangerous persons." Foreign Spectator, *No. XI*, Fed. Gazette, Nov. 28, 1788, in THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, VOL. XXXIX: BILL OF RIGHTS 379–81 (John P. Kaminski et al., eds., 2023). The author made no reference to disarming all criminals. *See ibid.*; *Williams*, 113 F.4th at 655.

The same ideas arose in New Hampshire. There, delegates considered a proposal that Congress "shall never" disarm citizens "unless such as are or have been in actual rebellion." 1 JONATHAN ELLIOTT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d ed. 1891). As was the case with the English kings of old and the more recent colonists, the delegates to the New Hampshire ratifying convention "placed themselves in the tradition of legislatures, Parliament, and English kings who sought to disarm individuals they deemed to be dangerous." *Williams*, 113 F.4th at 656.

The fact that many of these proposals were put forward by people skeptical of the Constitution does not lessen their importance. Quite the opposite. The Anti-Federalists won numerous battles during the ratification debates—and by far the biggest was the Bill of Rights. *See generally* Akhil Reed Amar, *Anti-Federalists, the Federalist Papers, and the Big Argument for Union*, 16 HARV. J. L. & PUB. POL'Y 111, 115 (1993) (discussing the Anti-Federalist desire for the Bill of Rights); *Williams*, 113 F.4th at 655–56; *see also Kanter*, 919 F.3d at 455–58 (BARRETT, J., dissenting). And, given the "longstanding view that the Bill of Rights codified venerable, widely understood liberties," the Anti-Federalists' insistence that the right to bear arms could be restricted if someone posed a public danger informs the

meaning of that codified right. *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008).

What's more, at least one prominent contemporary legal scholar agreed. William Rawle, a Founding-era lawyer, Supreme Court advocate, and civic leader, would later write one of the most thorough then-contemporary studies of the Second Amendment. *See* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 126 (reprt. 1970) (2d ed. 1829). In that document, Rawle discussed the history of the right to keep and bear arms. *Ibid.* He concluded that the "right ought not, however, in any government to be abused to the disturbance of the public peace." *Ibid*; *see also Williams*, 113 F.4th at 656 (quoting the same).

*

So what does our historical tradition of firearm regulation show? It reveals a time-honored right to keep and bear arms. *Heller*, 554 U.S. at 592; *Bruen*, 597 U.S. at 17. The generalized political or religious disarmaments of days past faded into distant memory as Americans embraced their individual right to own firearms. *Cf.* David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. REV. 1359, 1370–1408 (1998) (documenting that nineteenth century Americans viewed the Second Amendment as conferring an individual right to own firearms). And just as the Founding represented a rejection of English overreach in other areas, so too with the Second Amendment. No would-be American tyrant, then or now, can lawfully resurrect English abuses by merely claiming that innocent Americans' political views, religious associations, or possession of firearms are themselves dangerous. Rather, the early American evidence shows that disarmament can be applied only to certain dangerous criminals, and even then they had a chance to contest their dangerousness.

III

Given that history, the correct next step is to evaluate Cordova's as-applied challenge to § 922(g)(1). Since the provision burdens his Second Amendment right, the Government must demonstrate that its decision to disarm Cordova falls within the historical tradition of firearm regulation. *Bruen*, 597 U.S. at 24. In doing so, the government can look beyond those restrictions that existed during the Founding era. *Rahimi*, 602 U.S. at 691. As the Supreme Court has outlined, "holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Id.* at 692. Thus, the "appropriate analysis" involves a higher level of generality. *Ibid.* The inquiry is whether a challenged regulation "is consistent with the principles that underpin our regulatory tradition." *Ibid.* The task is to discern a principle that existed at the Founding era, and then to "apply faithfully the balance struck by the Founding generation to modern circumstances." *Ibid.* (citation modified). Doing so, the Supreme Court explains, avoids a Second Amendment that is "trapped in amber." *Id.* at 691.

I (A) start with the Founding-era principle that certain dangerous convicted criminals can be disarmed, so long as they have a chance to rebut the charge. Then I (B) apply the dangerousness principle to Cordova.

A

How does the dangerousness principle apply to crimes that did not even exist at the Founding—such as automobile theft or drug possession? It requires a close study of the "how" and the "why" of the regulation compares to restrictions in days past. *Rahimi*, 602 U.S. at 691–92.

In conducting this dangerousness inquiry, courts step into the role that magistrates and judges played in days past. After the Founding, such jurists would decide whether a person was dangerous. *See, e.g.*, 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY

in New England 211–12 (Nathaniel B. Shurtleff ed., 1853). This assessment would often take the form of loyalty oaths or attestations, but the fundamental task was to determine whether an individual was dangerous. To do so, the official would look to a person's characteristics, including his criminal record, to determine his level of danger.

Under circuit precedent, we should not limit this inquiry to a specific predicate offense. As I've explained, our earliest circuit precedent on point compels that result. *Reyes*, 141 F.4th at 686–87. In *Reyes*, the court examined the defendant's entire criminal history—both those convictions at the time of the guilty plea and those that the Government discovered after the fact. *See ibid.* And "[i]t is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." *Traxler*, 764 F.3d at 489 (quotation omitted). So, we should not be limited to the specific predicate offense.

At times, this dangerousness inquiry can be simple. Some crimes are obviously probative of dangerousness. As the Supreme Court has explained, there are some crimes that "every civilized nation considers itself bound to provide a severe punishment for when committed." *Mali v. Keeper of the Common Jail*, 120 U.S. 1, 17–18 (1887). Such crimes include murder, rape, assault, and robbery. These are quintessentially violent crimes that "speak directly to whether an individual is dangerous." *Williams*, 113 F.4th at 658. So, given the Founders disarmed dangerous individuals (the how) out of fear they threatened society (the why), disarmament is almost always appropriate for these offenses. *Rahimi*, 602 U.S. at 691–92.

Likewise, some defendants are clearly *not* dangerous. Consider, for example, crimes like mail fraud or making false statements on an application for food stamps. *See Kanter*, 919 F.3d at 440 (mail fraud); *Range III*, 69 F.4th

at 98 (food stamps). They cause no physical harm to another person or the community. So, given there is little chance of danger to the public, the "why" of such a regulation would be a poor match for the fear of public danger that justified disarming people during the Founding era. *Rahimi*, 602 U.S. at 691–92.

Criminals who commit offenses that fall between these poles present a harder question. *Williams*, 113 F.4th at 658. Consider crimes like drug trafficking or burglary. *See, e.g.*, *Kimble*, 142 F.4th at 309, 317–18 (5th Cir. 2025) (drug trafficking). In these circumstances, an offender may not have threatened physical violence against someone. But the act itself may pose a danger or share a close link to violence. *Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 922 (3d Cir. 2020) (BIBAS, J., dissenting). And burglary, as the Supreme Court has said, "by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime." *Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004). For crimes that put a victim's safety or public safety in jeopardy, the offense is often dangerous. Again, the "why" behind disarming such people who commit such crimes—their conviction shows they pose a danger to the public—matches the Founding-era concern. *Rahimi*, 602 U.S. at 691–92.

B

Next, we should apply this framework to Cordova. On the one hand, his prior offenses are, at least as felonies go, relatively nonviolent. One is a conviction for drug possession in a drug-free zone. The other is evading a police officer using a vehicle. This felony technically qualifies as a predicate offense under § 922(g)(1), but it is the lowest-level felony recognized in state law (a "state jail felony"). TEX. PEN. CODE ANN. § 38.04(b)(1)(B). Given that neither crime is inherently violent, Cordova's criminal history is of a less violent nature than the offenses in the mine-run of challenges to § 922(g)(1).

*See, e.g.*, *Diaz*, 116 F.4th at 467–69. And Cordova makes strong arguments that, standing alone, a drug possession offense does not merit disarmament. Blue Br. at 14–15 (noting that there is a lack of history and tradition of criminalizing the possession or use of marijuana or similar drugs).[5] And after the briefs were filed in this case, our court held that mere possession does not support disarmament under § 922(g)(1). *See United States v. Hembree*, 165 F.4th 909, 910 (5th Cir. 2026); *United States v. Mitchell*, 160 F.4th 169, 194 (5th Cir. 2025).

The problem for Cordova, though, is that he has a conviction for evading arrest with a vehicle. While vehicle evasion obviously did not exist during the Founding era, the "how" and the "why" of disarming someone with such a conviction matches the concerns that motivated previous generations' disarmament laws. First: the "how." It's obvious that disarmament is the same as now. Second, the "why." Then, the Founders disarmed those individuals convicted of dangerous conduct. And now, as this court has held, evading arrest with a motor vehicle is "purposeful, violent, and aggressive" and "involves a serious potential risk of personal injury to others." *United States v. Harrimon*, 568 F.3d 531, 534–35, 537 (5th Cir. 2009). Given that "[v]ehicular pursuits" are "often catastrophic," Cordova's decision to use a car to evade the police is probative of his dangerousness. *Lange v. California*, 594 U.S. 295, 324 (Roberts, C.J., concurring in the judgment); *cf. United States v. Lee*, 989 F.2d 180, 183 (5th Cir. 1993) (per curiam) (explaining that evading arrest in a vehicle created "a substantial risk

[5] In response, the Government cites several Founding-era laws that imposed the death penalty for counterfeiting and possessing stolen goods. Because the Founding generation punished counterfeiters with death, the Government reasons it can take away any small-time drug possessor's Second Amendment rights. But, as I've explained, focusing on the death penalty in this context is a fool's errand. And it runs contrary to the way we think about all other rights.

of serious injury"). Cordova's decisions posed a risk to his fellow citizens and demonstrated that he is dangerous. Thus, his challenge to § 922(g)(1) fails on the merits—and not just because *Diaz* and its progeny say so.

*

As this process shows, evaluating a defendant's as-applied challenge to § 922(g)(1) requires historical analysis. It requires looking beyond an individual predicate conviction. It requires looking at whether an individual is dangerous. That study coheres with the long English and American history of disarming dangerous people. Cordova's criminal history and characteristics demonstrate that he is dangerous. I would rely on that dangerousness analysis, not *Diaz*'s nonsensical legal standard, to hold that Cordova's constitutional challenge fails.